FARRINGTON v TOTAL PETROLEUM, INC

Docket No. 91677. Argued November 9, 1992 (Calendar No. 7). Decided May 25, 1993.

Richard Farrington petitioned for workers' compensation on September 19, 1986, alleging disability due to a heart injury as a result of performing strenuous work during his employment with Total Petroleum, Inc. A magistrate awarded benefits. The Workers' Compensation Appeals Board, affirmed, concluding that there was substantial evidence to support the findings of the magistrate. The Court of Appeals, HOOD, P.J., and MAHER and CYNAR, JJ., affirmed in an opinion per curiam (Docket No. 113332). The defendant appeals.

In an opinion by Justice MALLETT, joined by Chief Justice CAVANAGH, and Justices LEVIN and BOYLE, the Supreme Court *held:*

The Workers' Compensation Appellate Commission correctly applied the substantial evidence standard in reviewing the magistrate's findings. The Court of Appeals and the WCAC erred in failing to recognize the "significant manner" standard for determining eligibility for compensation and instead finding that it was only necessary to ascertain whether the claimant's heart damage was linked to his employment. However, when that standard is applied to the magistrate's findings of fact, which were supported by the evidence, it is clear that the claimant met his burden of proof and that he is entitled to benefits.

1. The standards to be applied in reviewing a claim for workers' compensation under MCL 418.861a(2), (3); MSA 17.237(861a)(2), (3) are dependent on when the matter is reviewed by the Workers' Compensation Appeal Commission, not when a claim is filed initially. Where a claim was reviewed before October 1, 1986, findings of fact by a workers' compensation magistrate were considered conclusive if supported by competent, material, and a preponderance of the evidence on the whole record. Beginning on October 1, 1986, the standard

REFERENCES
Am Jur 2d, Workers' Compensation §§ 395-430; 686-721.
See ALR Index under Workers' Compensation.

became competent, material, and substantial evidence. Because the WCAC reviewed the claim in this case after October 1, 1986, the substantial evidence test was the appropriate standard. The legislative reforms were intended to impose a higher standard of proof on claimants, whether a claim is brought under chapter 3 for specific injuries or under chapter 4 for occupational diseases.

2. As of January 1, 1982, under MCL 418.301, 418.401; MSA 17.237(301), 17.237(401), heart injuries are compensable to the extent they are contributed to or aggravated or accelerated by employment in a significant manner. A claimant must show that the heart disease and injury were significantly caused or aggravated by employment, considering the totality of the occupational and nonoccupational factors and the claimant's health, and that the alleged cardiac injury resulting from work activities went beyond the manifestation of symptoms of the underlying disease. In this case, the Court of Appeals and the WCAC erred in determining that it was only necessary to ascertain whether the claimant's heart damage was linked to employment.

3. Even though the magistrate never specified whether he was imposing the significant manner standard, his finding that work-related events significantly contributed to the claimant's heart injury, which was amply supported by competent, material, and substantial evidence on the whole record, when analyzed under that standard, clearly indicates that the claimant is entitled to recovery.

Affirmed.

Justice RILEY, joined by Justices BRICKLEY and GRIFFIN, dissenting in part, stated that as part of the reform of the workers' compensation act in 1980, the Legislature enacted amendments that entailed restriction of expansive interpretations of liability placed on business by the courts, specifically the liberal standard involving cardiovascular injuries announced in *Kostamo v Marquette Iron Mining Co*, 405 Mich 105 (1979). To determine whether the employment contributed to or aggravated cardiovascular injury, the factfinder should consider both the importance of any work incident and the totality of the claimant's health and other nonoccupational factors. Unless the magistrate determines that the employment was a significant aggravating factor in the totality of the circumstances, no recovery should be permitted. Because in this case the findings of fact were premised on an incorrect legal standard, the case should be remanded for a new trial on the merits in light of the correct legal standard.

189 Mich App 298; 472 NW2d 60 (1991) affirmed.

1. WORKERS' COMPENSATION — APPELLATE COMMISSION — STANDARD
   OF REVIEW.

   The appropriate standard of review by the Workers' Compensa-
   tion Appellate Commission after October 1, 1986, of a claim for
   workers' compensation, is competent, material, and substantial
   evidence on the whole record (MCL 418.861a[3]; MSA
   17.237[861a][3]).

2. WORKERS' COMPENSATION — HEART DAMAGE — STANDARD OF COM-
   PENSABILITY.

   As of January 1, 1982, heart injuries are compensable to the
   extent they are contributed to or aggravated or accelerated by
   employment in a significant manner (MCL 418.301, 418.401;
   MSA 17.237[301], 17.237[401]).

*Chambers, Steiner, Mazur, Ornstein & Amlin,
P.C. (by Angela J. Nicita and Douglas A. Merrow),
for the plaintiff.*

*Ryan, Jamieson, Hubbell & Morris, P.C. (by
Christopher D. Morris), for the defendant.*

Amicus Curiae:

*Conklin, Benham, Ducey, Listman & Chuhran,
P.C. (by Martin L. Critchell),* for Michigan Self-
Insurers' Association.

MALLETT, J. This action results from a myocar-
dial infarction[1] suffered by plaintiff Richard Far-
rington as a result of performing strenuous work
activities during his employment with defendant
Total Petroleum, Inc. Because of his resulting

[1] A myocardial infarction is a cardiac injury commonly known as a
"heart attack." The term heart attack, however, should not be con-
fused with other heart injuries, such as cardiac rhythm disturbances,
congestive heart failure, or even sudden death. A myocardial infarc-
tion results from a cardiac ischemia, or loss of blood flow to the heart,
which is severe enough and prolonged enough to kill heart tissue and
produce permanent structural damage to the organ. Usually, the
ischemia must last twenty minutes or longer to result in irreversible
injury to the muscle. See Juge & Phillips, *A new standard for
cardiovascular claims in workers' compensation,* 43 La L R 17, 22
(1982).

disability, plaintiff sought workers' compensation benefits.

This case presents two issues. The first is whether the Workers' Compensation Appellate Commission used the correct standard of review as set forth in MCL 418.861a(3); MSA 17.237(861a)(3). The second is whether the WCAC and the Court of Appeals used the proper legal standard to determine whether plaintiff's heart injury was compensable under the Workers' Disability Compensation Act.

We hold that the WCAC applied the appropriate statutory standard of review, but utilized an improper legal standard to determine injury compensability. Nevertheless, applying the law to these facts, we affirm the Court of Appeals benefits award decision.

### I. FACTS

Plaintiff began working for defendant in 1973. At the time of his injury, he was employed as a manager at defendant's self-service gas station. His duties included overseeing employee scheduling, payroll, maintenance of the premises, inventory control, stocking shelves and occasionally shoveling snow in those areas where the station's plow could not reach. On February 25, 1986, at about 6:15 A.M., plaintiff began to perspire and experience chest pains, dizziness, and shortness of breath, while carrying ten to fifteen cases of soda to refill the station's soda coolers. The cases weighed approximately thirty pounds. Plaintiff rested until the chest pains stopped, about thirty to forty minutes after their onset, but he continued to have discomfort in his chest for the remainder of the day. Plaintiff left work and went home an hour early at approximately 12:30 or 1:00 P.M.

The following morning plaintiff returned to work at 5:00 A.M., his usual starting time. About 11:00 A.M., plaintiff went outside to shovel snow. After shoveling for approximately fifteen minutes, he once again began to perspire and experience severe chest pain, dizziness and nausea. He rested, but continued to feel tired and sluggish. Consequently, he left work and went home to rest.

The next day at work, February 27, 1986, at approximately 6:00 A.M., plaintiff again experienced severe chest pain while loading soda into the coolers. He attempted to relax, but the pain did not subside. He subsequently left work at approximately 9:00 or 9:30 A.M. and was examined by a doctor, who immediately admitted him to a hospital. There, he was treated by Dr. Zegerius, a specialist in cardiology.

Plaintiff's reoccurring chest pain and the questionable changes in his electrocardiogram initially led Dr. Zegerius to conclude that he suffered from an acute anteroseptal or posterior myocardial infarction at the time of admission. Although plaintiff's initial blood enzyme tests did not reveal damage to the heart at that time, he continued to experience chest pain. Dr. Zegerius diagnosed plaintiff as having unstable angina and admitted him for further cardiac evaluation. Doctors eventually stabilized plaintiff's heart condition with oxygen and nitroglycerin treatments.

On February 28, 1986, plaintiff performed a routine treadmill test, but could not endure the machine for more than two minutes because he felt his chest becoming "tight." On March 1, 1986, plaintiff took a sponge bath at about 9:00 A.M. and became so tired that he returned to bed. At approximately 10:00 A.M., he again complained of intense chest pain, and an EKG test showed that on this particular occasion he had suffered a myocar-

dial infarction. Plaintiff subsequently underwent successful balloon angioplasty. The hospital discharged plaintiff on March 8, 1986, and Dr. Zegerius released plaintiff to return to work on April 21, 1986. Plaintiff did not miss any more work because of his heart condition at the time of the administrative hearing in November of 1987.

Plaintiff petitioned for workers' compensation on September 19, 1986. He alleged his disability extended from February 27, 1986, until April 21, 1986. The record before Magistrate Schroder revealed that the forty-nine year old plaintiff had a preëxisting coronary heart disease, but no previous history of cardiac problems. Dr. Zegerius noted in the record that plaintiff was mildly obese, but he considered plaintiff's weight a minor factor in triggering his heart injury.

Dr. Sentkeresty, the defendant's medical expert, examined plaintiff on March 9, 1987, approximately one year after plaintiff's myocardial infarction. The doctor noted that plaintiff had quit smoking about twenty years ago. Plaintiff began smoking at the age of seventeen and, at his peak, smoked eight to ten cigarettes per day. He rarely used alcoholic beverages. Although plaintiff's father had hypertension, there was no other history of common familial disorders. Plaintiff told Dr. Sentkeresty that he had had a low elevation of his blood pressure, but once he lost weight it had improved one or two years ago. During the exam performed by Dr. Sentkeresty, a test revealed that his blood pressure was in fact slightly elevated. His cholesterol count was also high but not abnormal. Dr. Sentkeresty noted that plaintiff had scarlet fever at age six and rheumatic fever in 1957, however, these were not believed to be risk factors for his myocardial infarction.

With regard to his job, plaintiff told Dr. Zegerius

that he normally filled soft drink coolers every other day during the winter and twice a day during the summer. During his exam by Dr. Sentkeresty, plaintiff stated that he considered his managerial duties as stressful and that, although he slept variably, he generally felt good and had sufficient energy.

In testifying before Magistrate Schroder, Dr. Zegerius opined that plaintiff's work activities were a significant cause of his unstable angina at the time of admission to the hospital and of his subsequent myocardial infarction two days later. Dr. Sentkeresty disputed the causal connection between plaintiff's exertion at work and his myocardial infarction. On December 12, 1987, the magistrate awarded plaintiff benefits for the claimed period of disability.

The parties subsequently filed briefs on appeal to the WCAC in March and April of 1988, and the WCAC issued its decision in October of 1988. The commission employed the "substantial evidence" standard of review set forth in MCL 418.861a(3); MSA 17.237(861a)(3) to affirm the magistrate's decision and to conclude that there was ample support for his findings. The WCAC dissent opinion agreed that the magistrate's finding was supported by competent, material, and substantial evidence on the whole record, but argued that the correct standard of review required that the magistrate's findings be supported by a preponderance of the evidence. The dissent contended that the plaintiff failed to prove that his myocardial infarction was work related under the preponderance standard.

The Court of Appeals unanimously affirmed the WCAC majority opinion. 189 Mich App 298; 472 NW2d 60 (1991). This Court granted defendant's motion for leave to appeal, and the Michigan Self-

Insurers' Association requested to appear as amicus curiae supporting defendant's position.

## II. APPROPRIATE STANDARD OF APPELLATE REVIEW

The first issue before this Court is whether the WCAC applied the correct standard of appellate review when it used the "substantial evidence" test as set forth in MCL 418.861a; MSA 17.237(861a).

The Legislature added § 861a to the WDCA as part of 1985 PA 103, effective July 30, 1985. It provides in pertinent part:

> (1) Any matter for which a claim for review under section 859a has been filed shall be heard and decided by the appellate commission.
> (2) Until October 1, 1986 findings of fact made by a worker's compensation magistrate shall be considered conclusive by the commission if supported by competent, material, and a preponderance of the evidence on the whole record.
> (3) Beginning October 1, 1986 findings of fact made by a worker's compensation magistrate shall be considered conclusive by the commission if supported by competent, material, and substantial evidence on the whole record. As used in this subsection, "substantial evidence" means such evidence, considering the whole record, as a reasonable mind will accept as adequate to justify the conclusion.

Because the WCAC reviewed plaintiff's claim after October 1, 1986, we hold that the substantial evidence test as set forth in § 861a(3) was the appropriate standard.

The plain meaning of § 861a is unambiguous. As this Court has held, where the language of a statute is clear, there is no need for interpretation; it must be applied as written. *Owendale-Gagetown*

*School Dist v State Bd of Ed,* 413 Mich 1, 8; 317 NW2d 529 (1982). The plaintiff argues that the commission must apply the substantial evidence standard for any matter coming under *review* after October 1, 1986. Defendant asserts that the key date to determine the appropriate standard is when a claimant *first files* for benefits and not when a claimant files for WCAC review. Defendant contends that the statute should be interpreted to read that any initial filing for workers' compensation after October 1, 1986 should be held to the substantial evidence standard.

The legislative intent is discoverable by a complete reading of § 861a. It is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature. *Dagenhardt v Special Machine & Engineering, Inc,* 418 Mich 520; 345 NW2d 164 (1984); *Workman v DAIIE,* 404 Mich 477, 507; 274 NW2d 373 (1979). A careful review of § 861a reveals that subsection 1 begins by setting the bounds of the commission's jurisdiction. As stated, the WCAC has the power to hear and decide only those matters in which a claim of review has been filed. Subsections 2 and 3 further define the scope of the appellate commission's jurisdiction by advancing the applicable standard of review for findings of facts made by a magistrate. In the instant case, the magistrate made his decision on December 12, 1987, well after the October 1, 1986 cutoff.

The Legislature did not adopt any language that would indicate that the standards of review set forth in subsections 2 and 3 were dependent upon when the claim was initially filed. Absent an express statement of limitation by the Legislature, it would be improper for this Court to impose such

a restriction. *Owendale-Gagetown, supra.* If the Legislature intended the standard of review to depend on when the initial claim for benefits was filed, as defendant contends, it would have expressly stated. In other sections of the WDCA, for example, the Legislature included language that specifically limited the application of a provision depending upon the date an application is first filed.[2] Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there. *People v Jahner,* 433 Mich 490, 504; 446 NW2d 151 (1989); *Voorhies v Recorder's Court Judge,* 220 Mich 155, 157-159; 189 NW 1006 (1922). In the instant case, the Legislature chose not to include such language, as it had on other occasions, that triggered a new standard of WCAC review on the basis of a claim's original filing date. In short, this Court may not do on its own accord what the Legislature has seen fit not to do.

Moreover, the legislative history, evidenced by previous drafts of the amendments, also contains no indication that the Legislature intended that the original filing date be the decisive factor in determining the standard of review. Section 861a was enacted as part of 1985 PA 103, which contains several amendments of the WDCA. This public act restructured the administration procedure for adjudicating    contested    workers'    compensation

---

[2] See, e.g., MCL 418.862(2); MSA 17.237(862)(2) (where an initial application for workers' compensation is filed after March 31, 1986, filing for a claim of review does not stay medical payments); MCL 418.858(2); MSA 17.237(858)(2) (sets forth the standard to calculate attorney fees charged for those applications initially filed after March 31, 1986); MCL 418.859a; MSA 17.237(859a) (where an initial application for workers' compensation is filed after March 31, 1986, on appeal, claimants must seek a review of their claims with the WCAC).

claims.[3] Originally, 1985 PA 103 began as SB 7. Section 274(7) of SB 7 stated that the WCAC would use the substantial evidence standard for any claim it reviewed.[4] The Legislature did not indicate a specific date when this new standard should be imposed. Senate Bill 7 did, however, stipulate that the substantial evidence standard of review would be applicable in those cases reviewed by the WCAC if the matter was filed after the effective date of 1985 PA 103. Neither SB 7 nor any other subsequent version of the bill contained any language that would limit application of the substantial evidence review on the basis of when the original application for benefits was filed.[5] Although the legislative history is vague with regard to why the October 1, 1986, date was chosen, there is no indication that this date was intended as a cutoff triggered upon one's initial filing.

The nature of the new structural changes adopted by the Legislature in 1985 to reform the workers' compensation appeals procedure provide further insight into the appropriate standard of review after October 1, 1986. The new system implemented by the amendments was supposed to phase in the legislative plan for reform on a scheduled basis. As evidenced by the statutes themselves, the Legislature sought to create a functional appellate commission by January 1, 1986,[6] and a functional board of magistrates by March 31, 1986.[7] The magistrates' jurisdiction then became effective on April 1, 1986.[8] Thereaf-

---

[3] *Civil Service Comm v Dep't of Labor,* 424 Mich 571, 584-585; 384 NW2d 728 (1986).

[4] SB 7, § 274(7).

[5] See § 861a(a) of SB 7 (S-1) Draft 3; SB 7 (S-3) Draft 1; SB 7 (S-2) Draft 2; SB 7 (S-3); SB 7 (S-4), R-1; SB 7 (H-3), SB 7 (H-4).

[6] MCL 418.274(1); MSA 17.237(274)(1).

[7] MCL 418.213(1); MSA 17.237(213)(1).

[8] MCL 418.206; MSA 17.237(206).

ter, all claimants who first filed applications after March 31, 1986, were assigned to a magistrate,[9] who was required to provide detailed written opinions explaining the findings of fact and conclusions of law.[10] Subsequent claims of review filed following these decisions were then to be heard by the appellate commission.[11] The commission replaced the outgoing Workers' Compensation Appeal Board and was given the authority to adopt the magistrate's order in whole or in part.[12] The amendments also restricted the appellate jurisdiction of the newly created commission to appeals from magistrate decisions. The de novo review of the WCAB was eliminated.[13]

This new structure and the substantial evidence review standard were enacted to fulfill the legislative purpose at the time. As Michigan courts have held, a fundamental rule of statutory construction is to ascertain the purpose and intent of the Legislature in enacting a provision. *In re Certified Question,* 433 Mich 710, 722; 449 NW2d 660 (1989). In this case, the WCAB's de novo review standard under the pre-1985 amendment compensation system was eliminated to decrease the endless backlog of appeals by giving greater deference to the magistrates' findings, and to discourage the filing

[9] MCL 418.206(2); MSA 17.237(206)(2).

[10] MCL 418.847(2); MSA 17.237(847)(2).

[11] MCL 418.859a(1); MSA 17.237(859a)(1), MCL 418.861a(1); MSA 17.237(861a)(1).

[12] MCL 418.861a(10); MSA 17.237(861a)(10).

[13] The Legislature also adopted specific provisions that ensured that a claim heard by a hearing referee or assigned to the WCAB under the pre-1985 amendment system would still be decided under the preponderance of the evidence standard, which was the existing standard of review when the claim was filed. The statutory provisions also ensured that the preponderance of the evidence standard of review in effect under the prior system would even be' applicable if the new appellate commission had to review the matter. See MCL 418.206(3); MSA 17.237(206)(3), MCL 418.860; MSA 17.237(860), MCL 418.266(4); MSA 17.237(266)(4).

of an overwhelming number of appeals. *Civil Service Comm v Dep't of Labor,* 424 Mich 571, 584-585; 384 NW2d 728 (1986); see also *Holden v Ford Motor Co,* 439 Mich 257, 260; 484 NW2d 227 (1992).[14]

A construction of subsections 861a(2) and (3) to permit application of the substantial evidence standard only in those cases in which the initial application for hearing was filed after October 1, 1986, would run contrary to the legislative purpose of unclogging the docket of the outgoing WCAB. Rather than allowing the appellate commission to begin serving its intended purpose under the new 1985 amendments, which would permit the WCAC to begin controlling its own docket, the defendant argues that the Legislature intended all claims first filed in the new system from March 31, 1986, until October 1, 1986, be subject to the stricter preponderance of the evidence standard. This result is contrary to the legislative intent because this interpretation would prolong the backlog that the amendments were intended to address.

The Legislature's clear purpose was that all claims reviewed by the WCAC after October 1, 1986, be reviewed by the substantial evidence test to effect the changes implemented by the 1985 amendments. There is nothing in the WDCA amendments that indicates that the group of cases

---

[14] Although this Court did not directly address the present issue in *Holden,* we summarized the effects of § 861a(3) in accordance with its language and history when we stated:

Under Act 103, beginning October 1, 1986, de novo review was eliminated. Henceforth, findings of fact by a workers' compensation magistrate were to be considered conclusive, on administrative appellate review by the WCAC, if supported by "competent, material, and substantial evidence on the whole record." [*Id.* at 261, citing MCL 418.861a(3); MSA 17.237(861a)(3).]

originally filed between April 1, 1986, and September 30, 1986, should be treated sui generis simply because of their initial filing dates.

### III. APPROPRIATE LEGAL STANDARD

We now turn to whether the WCAC and the Court of Appeals used the proper legal standard to determine whether plaintiff's heart injury was compensable under the WDCA.

In *Kostamo v Marquette Iron Mining Co*, 405 Mich 105, 116; 274 NW2d 411 (1979), this Court held:

> The workers' compensation law does not provide compensation for a person afflicted by an illness or disease not caused or aggravated by his work or working conditions. Nor is a different result required because debility has progressed to the point where the worker cannot work without pain or injury. Accordingly, compensation cannot be awarded because the worker may suffer heart damage which would be work-related if he continued to work. *Unless the work has accelerated or aggravated the illness, disease or deterioration and, thus, contributed to it, or the work, coupled with the illness, disease or deterioration, in fact causes an injury, compensation is not payable.* [Emphasis added.]

In *Kostamo*, this Court advanced an alternate two-pronged standard to determine compensability under the WDCA. An employee with an ordinary disease or preëxisting condition was entitled to workers' compensation, if it could be shown either that (1) the work accelerated or aggravated the disease or condition, and thus contributed to it, *or* (2) the work, coupled with the disease, in fact caused the injury.

In 1982, after *Kostamo*, the Legislature amended

the "personal injury" definition of occupational diseases under chapter 4 of the WDCA, MCL 418.401; MSA 17.237(401), and that of specific injuries under chapter 3, MCL 418.301; MSA 17.237(301). The enacted amendments, effective January 1, 1982, added the following language to the definitions of these sections:

> Mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions, shall be compensable if contributed to or aggravated or accelerated by the employment in a *significant manner.* [Emphasis added.]

By placing the "significant manner" amendment in both §§ 401(2)(b) and 301(2) of the WDCA, the Legislature intended to apply the standard to claims invoking either chapter. Consequently, both prongs of *Kostamo* were also effected. Plaintiff was awarded compensation for disability resulting from a heart injury (*Kostamo's* second prong). A heart injury is a "heart condition" within the meaning of the terms "*conditions* of the aging process, including but not limited to *heart* and cardiovascular *conditions* . . . ." (Emphasis added.)

Plaintiff argues and the Court of Appeals held that the significant manner amendments apply only to claims under *Kostamo's* first prong. Plaintiff contends that because the Legislature adopted the amendment language from the first prong of the *Kostamo* standard,[15] it intended to restrict the significant manner amendment to occupational

---

[15] The first prong of the *Kostamo* standard states: "the work has accelerated or aggravated the illness, disease or deterioration and, thus, contributed to it . . . ." *Id.* at 116. Similarly, the language adopted by the Legislature states that heart and cardiovascular conditions are compensable if "contributed to or aggravated or accelerated by the employment in a significant manner." MCL 418.401(2)(b); MSA 17.237(401)(2)(b), MCL 418.301(2); MSA 17.237(301)(2).

diseases covered by that prong. We disagree. We do not find plaintiff's analysis probative of the legislative intent in this case. The argument fails to consider the fact that the Legislature simultaneously amended the same sections in chapters 3 and 4. Statutory amendments enacted by the same Legislature to become effective on the same date and relating to the same subject matter must be construed together for purposes of determining legislative intent. *People v Rogers,* 438 Mich 602; 475 NW2d 717 (1991); *Reed v Secretary of State,* 327 Mich 108; 41 NW2d 491 (1950). The body of legislative reforms enacted in the early 1980's, including the significant manner amendments, were designed to impose on claimants a higher standard of proof, whether the claim is brought under chapter 3 for specific injuries or under chapter 4 for occupational diseases.[16]

Thus, the legislative policy evidenced for heart disease after the 1982 amendments would restrict benefits to claimants under the second prong of *Kostamo,* as in the instant case, who could establish that their heart disease and injury were significantly caused or aggravated by employment. Included in this standard is the requirement that claimants also prove that the alleged cardiac injury resulting from work activities went beyond the manifestation of symptoms of the underlying disease. The heart injury must be significantly

[16] A purpose of the comprehensive 1980 and 1981 revisions of the workers' compensation system was to overturn or modify expansive interpretations placed upon the act by this Court. Although the dollar amount of benefits payable to workers eligible for compensation was increased, there can be no doubt that the Legislature also intended through its 1980 and 1981 reform efforts to narrow and restrict the eligibility qualifications. [*Dean v Chrysler Corp,* 434 Mich 655, 666-667; 455 NW2d 699 (1990). See also VanderLaan & Studley, *Workers' compensation reform: A case study of the legislative process in Michigan,* 14 U Mich J L Ref 451, 459-460 (1981).]

caused or aggravated by employment considering the totality of all the occupational factors and the claimant's health circumstances and nonoccupational factors.[17]

In the case at bar, the Court of Appeals and WCAC erred when they misstated the applicable legal standard subsequent to the 1982 legislative amendments. The panel noted that "because benefits were awarded pursuant to the second prong in *Kostamo,* we conclude that the WCAC properly determined that it was not required to employ the 'significant manner' language of § 401(2)(b). Rather, it was only necessary to determine whether plaintiff's heart damage was linked to his employment." 189 Mich App 307-308. *Miklik v Michigan Special Machine Co,* 415 Mich 364; 329 NW2d 713 (1982). The *Miklik* Court ruled that "work need not be the *sole* cause of the damage; it is sufficient if the employment is *a* cause." *Id.* at 370. (Emphasis in the original.) The opinion was based upon the premise that before 1982 a plaintiff need only show a mere causal relationship between heart injury and employment. As the Court stated, "heart damage, such as would result from a heart attack, is compensable if linked by sufficient evidence to the workplace." *Id.* at 368. This is clearly a lower standard than the significant manner amendment adopted by the Legislature in 1982. Our *Miklik* decision did, however, recognize that the standard for finding a causal relationship changed after the amendments. We emphasized that our decision was based "solely on the statu-

---

[17] Even though a claimant's everyday work activities might contribute to a heart injury in a significant manner, a factfinder must also consider the causal effect of everyday work activities in relation to the claimant's other, nonoccupational factors. These factors would include, for example, age, weight, diet, previous cardiac ailments or injuries, genetic predispositions, and the claimant's consumption of alcohol and use of tobacco or other drugs.

tory language at the time of the alleged injury."
*Id.* at 368, n 4. Thus, *Miklik* acknowledged that
the 1982 amendments changed the standard of
compensability for certain types of conditions, in-
cluding cardiovascular ailments such as myocar-
dial infarctions. The Court of Appeals in the in-
stant case, however, failed to recognize this new
standard.

### IV. PLAINTIFF'S CAUSAL CONNECTION

As we stated in *Holden v Ford Motor Co, supra,*
on judicial appellate review, our analysis is limited
to the issue whether the WCAC's findings are con-
sistent with the concept of administrative appel-
late review that is less than de novo review in
determining whether the magistrate's decision was
supported by competent, material, and substantial
evidence on the whole record. *Id.* at 267.[18]

_____

[18] The relevant statute, MCL 418.861a; MSA 17.237(861a), provides,
in part:

(3) Beginning October 1, 1986 findings of fact made by a
worker's compensation magistrate shall be considered conclu-
sive by the commission if supported by competent, material,
and substantial evidence on the whole record. As used in this
subsection, "substantial evidence" means such evidence, consid-
ering the whole record, as a reasonable mind will accept as
adequate to justify the conclusion.

(4) As used in . . . (3) "whole record" means the entire
record of the hearing including all of the evidence in favor and
all the evidence against a certain determination.

* * *

(10) The commission or a panel of the commission, may
adopt, in whole or in part, the order and opinion of the
worker's compensation magistrate as the order and opinion of
the commission.

(11) The commission or a panel of the commission shall
review only those specific findings of fact or conclusions of law
that the parties have requested be reviewed.

(12) The commission or a panel of the commission may
remand a matter to a worker's compensation magistrate for
purposes of supplying a complete record if it is determined that
the record is insufficient for purposes of review.

This Court and the Court of Appeals consider whether there are issues of credibility of live witnesses to be determined by the magistrate, the evidence considered and ignored by the magistrate and the WCAC, the care taken by the magistrate and the WCAC, and the reasoning and analysis of the magistrate and the WCAC. [*Id.* at 268.]

After conducting a qualitative and quantitative analysis of the evidence, as required by statute, the WCAC adopted the magistrate's findings. Citing the clear and unambiguous testimony of Dr. Zegerius and the argumentative and inconsistent testimony of defendant's medical expert, the WCAC found ample support for the magistrate's decision.

Plaintiff argues that even under the significant manner standard, he is entitled to recovery. We agree. We believe that the evidence supports the conclusion reached by the magistrate even when analyzed under the new standard. After examining the plaintiff one year after the injury, Dr. Sentkeresty, defendant's medical expert, disputed the causal connection between plaintiff's work and his cardiac injury. He testified:

[T]he myocardial infarction occurred while he was at complete bed rest and under close observation in a coronary care unit. One cannot place any cause of [sic] relationship upon his work activity at his place of employment. Clearly if he had the symptoms that he does describe then there is no reason to dispute this. These symptoms represent

(13) A review of the evidence pursuant to this section shall include both a qualitative and quantitative analysis of that evidence and ensure a full, thorough, and fair review thereof.

(14) The findings of fact made by the commission acting within its powers, in the absence of fraud, shall be conclusive. The court of appeals and the supreme court shall have the power to review questions of law involved with any final order of the commission . . . .

simply an expression of the underlying coronary atherosclerotic process as angina pectoris and nothing more than that.

Moreover, Dr. Sentkeresty testified that although exertion could bring about angina, he unequivocally disagreed that exertion could in fact precipitate a myocardial infarction:

> Not in my opinion, nor can I think of anybody that I ever examined or any of my personal patients in whom one could actually make that statement, and it is certainly well illustrated, and you don't need my usual quotes and stories relative to stress, work, and so on in heart attacks, but Mr. Farrington is certainly a perfectly good example since his myocardial infarction occurred while at rest in the coronary care unit while being monitored, still occurred despite that.

Despite Dr. Sentkeresty's assertions, he did concede that the purpose of admitting plaintiff would have been to fend off an impending myocardial infarction. The magistrate found this testimony argumentative and inconsistent. Dr. Sentkeresty's findings were rejected in favor of those of Dr. Zegerius, who concluded that specific work events contributed to plaintiff's eventual myocardial infarction.

Despite conflict in the medical testimony and literature regarding the existence of precipitating causes of myocardial infarctions, this Court has recognized that work-related stress, at times, can precipitate cardiac injury.[19] When confronted with

---

[19] *Kostamo, supra* at 126, citing American Heart Association, *Report of the committee on stress, strain and heart disease* (Reprinted from 55 Circulation, 1977), No 5, p 4. See, e.g., *Zaremba v Chrysler Corp,* 377 Mich 226; 139 NW2d 745 (1966); *Mottonen v Calumet & Hecla, Inc,* 360 Mich 659; 105 NW2d 33 (1960). See also McNiece, *Heart Disease and the Law* (Englewood Cliffs, NJ: Prentice-Hall, Inc,

the problem of reconciling conflicting medical evidence in cardiovascular claims with the statutory requirement that the injury be causally connected to the claimant's employment, this Court attempted to resolve the confusion by noting that

> [w]hile medical testimony may be helpful, even, ultimately, decisive, the trier of fact is obligated to consider all the testimony in determining legal causation. [*Kostamo* at 131.]

The fact that plaintiff's myocardial infarction in the instant case occurred away from the work place and two days after the last strenuous work-related activity did not conclude the magistrate's analysis. After the heart injury had been documented, the magistrate found it necessary to retrace those events and specific circumstances that could have conceivably led to the claimant's myocardial infarction.

As the *Kostamo* Court suggested, in addition to medical testimony, other "potentially *significant* factors in the causal equation"[20] to include are the temporal proximity of the cardiac episodes to the work experience, the physical stress to which the plaintiff was subjected, the conditions of employment, and the repeated return to work after each episode. *Id.* at 130. These factors set forth in *Kostamo* are, of course, not all inclusive. After the enactment of the "significant manner" amendments, these occupational factors must now be considered together with the totality of claimant's health circumstances to analyze whether the heart

1961), indicating the nationwide acceptance of the proposition that physical exertion can precipitate cardiac disability or death.

[20] *Id.* at 131 (emphasis added).

injury was significantly caused by work-related events.[21]

As the record in the instant case indicates, the magistrate's analysis included a number of these causal elements. The plaintiff's lay testimony demonstrates a temporal proximity between the cardiac episodes and the work experience. As the record indicates, plaintiff experienced intense chest pain on February 25, 1986, while moving cases of soda. The same symptoms returned the following day while shoveling snow, and again, on February 27, 1986, while reloading soda into the coolers. On each of these occasions, plaintiff's chest pain was accompanied by nausea, perspiration, and dizziness. The physical stress to which plaintiff was subjected constituted the most strenuous part of his managerial duties, most of which were sedentary in nature. Despite these cardiac episodes, his position required him to repeatedly return to work after each occurrence. His exertion eventually caused his hospitalization and, according to his treating physician, his myocardial infarction two days later on the morning of March 1, 1986. Physical examinations by both testifying physicians did not reveal any significant nonoccupational or health factor that would have precipitated the instant heart injury.

The magistrate never specified whether he was imposing the significant manner test. However, on the basis of this testimony, the magistrate was "led to the inescapable conclusion that Plaintiff's heart attack and 'premonitory symptoms' were solely the result of his work activity." The magistrate emphasized that "[t]he facts presented in this case present the strongest possible scenario of work relationship cardiac disability . . . ." The record supports the magistrate's conclusion.

[21] See n 17.

The fact that plaintiff's myocardial infarction occurred two days after his admission to the hospital does, however, require us to examine closely the medical evidence that led Dr. Zegerius to conclude that the delayed onset of plaintiff's heart injury was causally connected to his work, despite the time lapse. In 1979 in *Kostamo,* this Court relied upon medical evidence that stated that precipitating events leading to a heart injury were possible, but that, in most cases, the causal events were unknown. Fourteen years have passed since *Kostamo* was decided. Recent advances in the pathophysiology of myocardial infarctions have provided physicians with a keener insight into those events which may result in heart injury, and specifically those events that conceivably trigger a delayed myocardial infarction.[22]

Considering the increased knowledge regarding

---

[22] Specifically, plaque (the abnormal fatty deposits on the inner layer of an artery) and thrombosis (the formation, presence, or development of a blood clot occluding a vessel) may prove helpful in explaining a delayed myocardial infarction. Medical researchers have found that

accumulated data warrant a re-examination of the accepted view that, in the absence of an obvious triggering activity (i.e., in 60-70% of cases), myocardial infarction is unrelated to activities immediately prior to its occurrence. . . . It is now known that: (1) the onset of myocardial infarction, as well as sudden cardiac death is more frequent after the normal time of awakening; (2) the occurrence of silent myocardial ischemia has a parallel morning increase; (3) there are identifiable physical and psychologic triggers of silent ischemia; (4) *thrombosis complicating a ruptured atherosclerotic plaque causes myocardial infarction; (5) plaques pass through different stages of activity and presumed likelihood of rupture;* (6) activities such as handgrip, bicycle exercise, and exposure to cold cause inappropriate vasoconstriction in atherosclerotic coronary arteries; (7) morning activities cause physiologic changes likely to trigger myocardial infarction, such as surges in arterial blood pressure, sympathetic activity, and platelet aggregability; and (8) beta blockade and aspirin, which inhibit these processes, prevent infarction. [Emphasis added. Muller, *Probable triggers of onset of acute myocardial infarction,* 12 Clinical Cardiology 473, 474.]

the role of plaque ruptures in the pathogenesis of myocardial infarctions, it was reasonable for the magistrate to rely on the testimony of Dr. Zegerius and to conclude that the repeated exertion by carrying the soda bottles and shoveling snow were three separate work-related events that triggered the plaintiff's eventual myocardial infarction.[23] As Dr. Zegerius noted:

> [A]s a contributing factor with the presence of preëxisting coronary artery disease, I believe overexertion or just moderately strenuous exertion is a precipitating factor in some patients and causing

[23] As recent medical studies have shown, plaque fissuring or ruptures and thrombosis may play a significant role in the onset of myocardial infarctions triggered by physical stress. Ciampricotti & El Gamal, *Exercise-induced plaque rupture producing myocardial infarction*, 12 Int'l J of Cardiology, pp 102-108. Medical studies have revealed that almost all infarct-related coronary arteries showed plaque rupture, the pathological basis of unstable angina and myocardial infarction. Most importantly, this phenomenon is helpful in explaining the delayed onset of a myocardial infarction. Medical research has noted that the "dynamic changes initiated by plaque rupture may have a rapid or relatively long evolution thus explaining the delay between the end of the sporting activity and the onset of symptoms or sudden death." *Id.* at 108. On the basis of this recent medical research, plaintiff's initial stress of carrying soda bottles and shoveling snow may have produced a small rupture in a plaque with a mural thrombosis, that expanded with each reoccurring incident or strenuous activity at work and eventually led to the myocardial infarction while hospitalized. Muller, n 22 *supra,* p 474. See also Tofler, *Analysis of possible triggers of acute myocardial infarction, (the MILIS study),* 66 Am J of Cardiology, pp 22, 25.

A reëxamination of the role of acute triggers of AMI [acute myocardial infarction] is now warranted due to advances in understanding the role of plaque fissuring and thrombosis in the pathophysiology of AMI and to recent studies showing an increased morning incidence of AMI. These findings challenge the view that AMI is unrelated to the day's activity. In the present study, the most commonly reported possible triggers were emotional upset and physical activity. Both mental stress and physical activity may predispose to plaque rupture and coronary artery occlusion by increasing blood pressure and plasma catecholamines and by producing vasoconstriction and enhanced coagulability.

unstable angina by placing a demand on the heart, increased workload is required, and if the heart is deprived of its blood supply, it may become unstable and certainly he may develop angina at that point.

Dr. Zegerius further opined that, in the instant case, plaintiff's "unstable angina was precipitated by heavy exertion at work and that this was a major contributing factor to his unstable angina syndrome, and eventual myocardial infarction." Recent medical research examined here support Dr. Zegerius' testimony.

Therefore, applying the correct legal standard to the magistrate's findings of fact, which are supported by the evidence, it is clear that plaintiff met his burden of proof under the "significant manner" test and is entitled to benefits. Although we reverse the Court of Appeals insomuch as it applied the wrong legal standard, we affirm the award of benefits.

CAVANAGH, C.J., and LEVIN and BOYLE, JJ., concurred with MALLETT, J.

RILEY, J. (*dissenting in part*). While I agree with the majority regarding the issues resolved in parts I to III and join those holdings, because the majority inappropriately utilizes findings determined under an incorrect legal standard, I respectfully dissent from the Court's holding in part IV.

I

As recognized by the majority, in 1982 the Legislature amended the WDCA to require that a claimant who has suffered injury from heart or cardiovascular conditions establish that employment contributed to or aggravated or accelerated the injury

in a significant manner to recover compensation under the act. MCL 418.301, 418.401; MSA 17.237(301), 17.237(401).

The amendments at issue were but a component of a broad reformation of the WDCA, which was motivated by a crippled economic environment and a perceived need to reduce the burden and costs imposed upon free enterprise by the then-existing WDCA.[1] A major portion of the reform entailed the restriction of expansive interpretations of liability placed on business by the courts:

A purpose of the comprehensive 1980 and 1981 revisions of the workers' compensation system was to overturn or modify expansive interpretations placed upon the act by this Court. Although the

[1] Indeed, the legislation's proponents explained that reducing the excessive costs of the then-current WDCA was essential to the economic survival of Michigan:

Since 1979, and prior to that, 1978 during the elections, everybody said that worker's compensation is the highest priority in the State of Michigan. We cannot afford to lose industry and jobs in this state. We cannot afford to see people going to other states . . . .

*　*　*

I think it is a Number One priority; one that we have neglected. One that we have pushed aside. One that we have tried to pacify by saying that we are going to have this study committee, or that study committee, but it is one that is very necessary that we get at if we want to retain Michigan as a state than [sic] can provide jobs and not as an industrial wasteland. [1980 Journal of the Senate 820 (Senator Welborn).]

Senator Guastello echoed his colleague's premonitions just before introduction of the reform bill:

[A]ll of us here today, both on the floor of the Senate and in the galleries, are faced with a real moment of truth as far as Michigan is concerned and I think that moment of truth is simply—what are we going to do to insure a healthy economic climate, not only for ourselves in this state, but for our children. [1980 Journal of the Senate 822.]

See also 1980 Journal of the Senate 1310 (Senator DeMaso).

dollar amount of benefits payable to workers eligible for compensation was increased, there can be no doubt that the Legislature also intended through its 1980 and 1981 reform efforts to narrow and restrict the eligibility qualifications. [*Dean v Chrysler Corp*, 434 Mich 655, 666-667; 455 NW2d 699 (1990).]

In fact, as recognized by the majority, the amendments at issue were specifically designed to replace the liberal standard of recovery for cardiovascular injuries established in *Kostamo v Marquette Iron Mining Co*, 405 Mich 105, 116; 274 NW2d 411 (1979). The legislative intent was undoubtedly to protect employers from unfairly paying compensation to workers suffering heart injuries not significantly caused by employment. The specific legislative history reveals that the Legislature believed that the unamended statute did "not prescribe definite standards as to what constitutes compensable heart or mental disabilities." Workers' Compensation Reform Task Force, Report of the Special Committee to Study Workers' Compensation, December, 1980, Issue No. 2c. Hence, proponents of the bill maintained "that the lack of such standards has led to reckless judicial interpretation of the disability standard as it applies to heart and mental cases resulting in compensation being paid to workers whose disability was not work related." *Id.* A copy of *Kostamo, supra,* was even attached to the task force report discussing the issue. *Id.* The Legislature, therefore, amended the WDCA to prohibit compensation for "heart and cardiovascular conditions" unless they were "contributed to or aggravated or accelerated by the employment in a significant manner." MCL

418.301(2); MSA 17.237(301)(2); MCL 418.401(2)(b); MSA 17.237(401)(2)(b).[2]

In sum, to determine whether the employment contributed to or aggravated cardiovascular injury, the factfinder should consider both the importance of any work incident and the totality of the claimant's health and other nonoccupational factors. Unless the magistrate determines that employment was a significant aggravating factor in the totality of circumstances, no recovery is permitted.

II

In any event, all the triers of fact below ignored the Legislature's mandate and granted benefits by relying on an erroneous liberal standard of recovery. Hence, the trier of fact did not appropriately examine the surrounding circumstances to determine if the injury in question was significantly aggravated by plaintiff's employment. Because the findings of fact were premised on an incorrect legal standard, they are inherently suspect. Nevertheless, the majority accepts those findings as conclusive in the instant case. Therefore, I write separately because I believe that reliance on those findings is unwise and contradicts the clear intent of the Legislature to subject such fact finding to a higher degree of scrutiny. Indeed, the Court's utilization of the conclusions below deprives those presumed finders of fact their adjudicative role because they never possessed the opportunity to examine the facts in light of the correct legal standard. Moreover, the majority's reliance upon scientific authorities denigrates the role of the

[2] Similarly, the WDCA also prohibits compensation for "[a]n ordinary disease of life to which the public is generally exposed outside of the employment . . . ." MCL 418.401(2)(b); MSA 17.237(401)(2)(b).

factfinder by improperly assuming that such authorities would be utilized by the factfinder.[3] The better course would permit the factfinder to determine which authorities of causation are persuasive. Thus, I would remand this case for a new trial on the merits in light of the correct legal standard.

BRICKLEY and GRIFFIN, JJ., concurred with RILEY, J.

[3] Furthermore, such reliance appears unwarranted as it tends to vitiate the standard of recovery by positing that nearly any activity may have a "significant" causal connection to a subsequent heart injury. See, e.g., *ante,* pp 223-224, ns 22, 23. Hence, the standard of recovery appears to be nearly as generous as the *Kostamo* standard clearly rejected by the Legislature.