# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

PEOPLE v HARRIS
PEOPLE v LITTLE
PEOPLE v HUGHES

Docket Nos. 149872, 149873, and 150042. Argued November 4, 2015 (Calendar No. 2). Decided June 22, 2016.

Nevin Hughes, a Detroit police officer, assaulted a person while on duty. The victim filed a complaint, resulting in an internal investigation by the Detroit Police Department's Office of the Chief Investigator (OCI). Hughes made statements during the investigation, under the threat of dismissal from his job, in which he denied the allegations. After a video recording of the incident came to light, Hughes was charged in the 36th District Court with felony misconduct in office, misdemeanor assault and battery, and obstruction of justice. Two other Detroit police officers, Sean Harris and William Little, who had been standing nearby during the incident and had made statements denying the allegations against Hughes during the OCI investigation under the threat of dismissal from their jobs, were also charged in the 36th District Court with obstruction of justice. The court, Katherine L. Hansen, J., relying on the Fifth Amendment of the United States Constitution and the disclosures by law enforcement officers act (DLEOA), MCL 15.391 *et seq*. (which states that an involuntary statement made by a law enforcement officer, and any information derived from that statement, may not be used against the officer in a criminal proceeding), determined that defendants' statements during the investigation could not be used against them. Because the obstruction-of-justice charges could not be sustained without using defendants' statements, the court dismissed those charges. The prosecution appealed. The Wayne Circuit Court, Bruce U. Morrow, J., affirmed the dismissal of the obstruction-of-justice charges. The Court of Appeals granted applications by the prosecution for leave to appeal with regard to each defendant and consolidated the appeals. The Court of Appeals, METER, P.J., and JANSEN, J. (WILDER, J., concurring in part and dissenting in part), reversed and remanded the cases to the district court for reinstatement of the obstruction-of-justice charges, concluding that neither the Fifth Amendment nor the DLEOA barred the use of defendants' false statements in the criminal proceedings. *People v Hughes*, 306 Mich App 116 (2014). The Supreme Court granted defendants' applications for leave to appeal. *People v Harris*, 497 Mich 958 (2015).

In an opinion by Justice ZAHRA, joined by Chief Justice YOUNG and Justices McCORMACK, BERNSTEIN, and LARSEN, the Supreme Court *held*:

Under the DLEOA, any information provided by a law enforcement officer, if compelled under threat of any employment sanction by the officer's employer, cannot be used against the officer in subsequent criminal proceedings. The act does not distinguish between true and false statements. Therefore, even if false, the officer's statements cannot be used against the officer in a subsequent prosecution.

1. In *People v Allen*, 15 Mich App 387 (1968), the Court of Appeals held that the Fifth and Fourteenth Amendments' benefits of freedom from a coerced waiver of the right to remain silent had to be respected even in a subsequent perjury prosecution. But as the Court of Appeals correctly observed, after *Allen* was decided, Michigan caselaw failed to keep pace with federal developments in this area of the law, including United States Supreme Court decisions clarifying that the Fifth Amendment only applies to truthful statements. Accordingly, the Court of Appeals repudiated its prior decision in *Allen* and held that the Fifth Amendment did not bar the use of defendants' false statements. The parties did not challenge the repudiation of *Allen* on appeal in the Michigan Supreme Court and, given the developments in the law in the time since *Allen* was decided, there was no reason to disturb that repudiation.

2. MCL 15.393 states that an involuntary statement made by a law enforcement officer, and any information derived from that involuntary statement, shall not be used against the law enforcement officer in a criminal proceeding. MCL 15.391(a) defines the term "involuntary statement" as information provided by a law enforcement officer, if compelled under threat of dismissal from employment or any other employment sanction, by the law enforcement agency that employs the law enforcement officer. The Legislature chose to use broad language in the DLEOA. The act does not expressly limit its protections to true statements, nor does it contain any express exception for perjury, lying, providing misinformation, or similar dishonesty. The word "information" does not connote only truthful information. In common usage, the word "information" is regularly used in conjunction with adjectives suggesting "information" may be true or false. The Court of Appeals erred when it concluded that the Legislature, by merely using the word "information," intended to impose an inherent requirement of veracity for involuntary statements to be covered under the DLEOA. Examination of the Legislature's use of "information" in other statutes leaves no doubt that in the DLEOA the unmodified term is properly construed to apply to all "information," whether true or false. Several statutes related to immunity and compulsory statements refer to "truthful information." The presence of the word "truthful" in these statutes is linked to this Court's ruling in *People v McIntire*, 461 Mich 147 (1999). At issue in *McIntire* was the proper interpretation of transactional immunity for witnesses compelled to answer potentially incriminating questions under MCL 767.6. In light of the statute's plain language at the time, the *McIntire* Court rejected the notion that a grant of immunity under MCL 767.6 extended only to truthful answers, reasoning that the text of the statute was clear and unambiguous and did not condition immunity on truthful testimony. The Legislature subsequently amended MCL 767.6 and other statutes to add "truthful" to terms such as "testimony" and "information" when the Legislature sought to add that limitation. The Legislature clearly knows how to limit information based on its veracity when such a limitation is important to conveying the Legislature's intent, but it chose not to do so in the DLEOA. Given the plain language of the act, the Legislature intended the word "information," as used in MCL 15.391, to include no inherent requirement of veracity, but instead to include statements that may be true or false.

3. Applying this interpretation of the DLEOA's plain language, the obstruction-of-justice charges brought against defendants had to be dismissed. Defendants provided statements regarding their encounter with the victim under threat of termination; these statements, though false, were protected by the DLEOA and, therefore, could not be used against defendants in a criminal proceeding. There was no dispute that defendants' statements provided the only basis for charging them with obstruction of justice and that the charges had to be dismissed if the officers' statements were inadmissible. While the result might be unpalatable, the Court could not substitute its own policy judgment in the face of the text of the statute.

Court of Appeals judgment reversed to the extent it held that under the DLEOA a law enforcement officer's involuntary statement could be used against the officer in a criminal proceeding if the statement was false. District court orders dismissing the obstruction-of-justice charges brought against defendants reinstated.

Justice MARKMAN, joined by Justice VIVIANO, concurring in part and dissenting in part, agreed with the majority opinion to the extent it held that the Fifth Amendment does not preclude the use of false statements by a law enforcement officer in a prosecution for obstruction of justice, but disagreed with it to the extent it held that the DLEOA precludes the use of false statements by a law enforcement officer in a prosecution for obstruction of justice. That is, contrary to the majority, Justice MARKMAN agreed with the Court of Appeals that false statements do not constitute "information" and therefore are not protected by the DLEOA. Lies do not constitute "information" as that term is commonly defined and understood. "Information" is commonly defined as knowledge. Lies do not impart knowledge. Indeed, one becomes increasingly less informed as a result of lies. A number of Michigan statutes refer to "inaccurate" or "misleading" information, supporting the Court of Appeals majority's conclusion that "information" signifies truthful information because in those unusual circumstances in which the Legislature is intending to refer to untruthful information, the Legislature recognizes that it needs to supply a modifier to precede "information" because, when unmodified, "information" signifies truthful information. Although the Legislature added "truthful" before "information" in a handful of statutes in the wake of *McIntire*, the Legislature likely did not believe it needed to add "truthful" before "information" when it enacted the DLEOA seven years later because (a) the DLEOA was viewed as a codification of United States Supreme Court decisions, which held that the Fifth Amendment did not protect false statements, and (b) the Legislature almost certainly perceived the word "information" as only connoting truthful information and simply did not feel obligated in perpetuity to add "truthful" every time it used the word "information." Nothing within *McIntire* can be read to suggest that false statements constitute "information." Rather, what most obviously can be drawn from the Legislature's response to *McIntire* is that *McIntire*'s equivalent treatment of truthful and false statements was squarely repudiated, an equivalency that is exactly repeated in the majority's interpretation in the instant case. Additionally, MCL 15.391 defines the term "involuntary statement" as information provided by a law enforcement officer, if compelled. Not only are lies not "information," but they are also not "compelled." That is why the Fifth Amendment prohibition against compelled self-incrimination does not protect perjury. The government did not compel defendants to lie; it sought only to "compel" defendants to tell the truth. That defendants chose to provide exculpatory falsehoods, rather than inculpatory truths, resulted in their loss of protection under the Fifth Amendment and the DLEOA. Moreover, the DLEOA is based on an obvious theory of

quid pro quo: police officers provide information to the government about police misconduct and in exchange the government agrees not to use the information against the officers. However, when the officers proceed to lie to the government, the government is deprived of that to which it was entitled in exchange for the grant of immunity—information. No Legislature, and no legislator, could conceivably have intended such a result. Construing the DLEOA in light of its purpose—assisting in the discovery of police misconduct—strongly supports the conclusion that "information" presupposes "truthful information." Simply put, there is no reason to enact an immunity statute if it cannot produce "information" that is helpful in uncovering police misconduct. Justice MARKMAN would have affirmed the judgment of the Court of Appeals.

©2016 State of Michigan

# OPINION

Chief Justice:        Justices:
Robert P. Young, Jr.    Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen

FILED  June 22, 2016

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                    No. 149872

SEAN HARRIS,

Defendant-Appellant.

---

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                    No. 149873

WILLIAM LITTLE,

Defendant-Appellant.

---

PEOPLE OF THE STATE OF MICHIGAN,

> Plaintiff-Appellee,

v                                                    No. 150042

NEVIN HUGHES,

> Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

ZAHRA, J.

In these three consolidated cases, we address the difficult question of whether defendants' false statements made while serving as law enforcement officers during an internal affairs investigation can be used against them in criminal proceedings. We conclude that under the disclosures by law enforcement officers act (DLEOA), MCL 15.391 *et seq.*, false or inaccurate information cannot be used against a law enforcement officer in subsequent criminal proceedings. To hold otherwise would defeat the Legislature's stated intent to preclude the use of "any information," MCL 15.393, a law enforcement officer is compelled to provide "under threat of . . . any . . . employment sanction,"[1] MCL 15.391(a). And while we agree with the Court of Appeals that the Fifth

---

[1] The DLEOA does not provide law enforcement officers with immunity. It only prevents a law enforcement officer's "involuntary" statements from being used against the officer in a criminal prosecution. MCL 15.391(a); MCL 15.393. A law enforcement officer may be prosecuted for criminal conduct based on evidence other than involuntary statements provided by the officer during an internal inquiry. In the present cases, defendant Hughes is subject to charges independent of the obstruction-of-justice charge that stems from his statement. And while we express no opinion regarding the validity of other charges that could have been asserted against defendants Harris and Little, we note

2

Amendment of the United States Constitution as interpreted in *Garrity v New Jersey*[2] does not compel this result, states may provide protections greater than those secured under the United States Constitution, and that is exactly what the Michigan Legislature did when it enacted the DLEOA in 2006. Simply stated, the DLEOA bars the use in a subsequent criminal proceeding of all information provided by a law enforcement officer under threat of any employment sanction. The act does not distinguish between true and false statements. Although the Legislature is free to amend the DLEOA to change the policy enacted, we are not. No matter how we view the policy, we must follow the language chosen by the Legislature. We reverse the judgment of the Court of Appeals and reinstate the orders of dismissal entered in the district court.

## I. BASIC FACTS AND PROCEEDINGS

This case arises out of a disturbing encounter between Dajuan Hodges-Lamar and defendants, who at the time were police officers for the city of Detroit. While on duty in November 2009, defendant Hughes approached Hodges-Lamar while he was seated in a

---

the Michigan Legislature has made it unlawful for a public official to willfully neglect one's duty. MCL 750.478.

[2] The Supreme Court of the United States held in *Garrity v New Jersey*, 385 US 493, 500; 87 S Ct 616; 17 L Ed 2d 562 (1967), that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." A hearing in which a law enforcement officer is called on to make a statement under threat of an employment sanction has become known as a "*Garrity* hearing," and the statement provided under that threat, a "*Garrity* statement." It was at a *Garrity* hearing that each defendant provided the *Garrity* statements that led to the common-law obstruction-of-justice charges at issue here.

3

car at a gas station.  Hughes initially appeared to question Hodges-Lamar, but quickly proceeded to assault him while defendants Harris and Little, who were also on duty, stood by and did nothing to stop the assault.  Hodges-Lamar filed a complaint with the Detroit Police Department, which spurred an internal investigation by the Detroit Police Department's Office of the Chief Investigator (OCI).  All three defendants were called to testify at a *Garrity* hearing.

The OCI presented defendants with an advice-of-rights form drafted by the Detroit Police Department.  In relevant part, the form broadly stated:

> 4. If I refuse . . . to answer questions . . . I will be subject to departmental charges which could result in my dismissal from the police department.
>
> 5. If I do answer . . . neither my statements or any information or evidence which is gained by reason of such statements can be used against my [sic] in any subsequent criminal proceeding.

The language of this form, like the language of DLEOA, did not expressly require truthful answers or truthful statements.[3]  Defendants also received a reservation-of-rights form drafted by the Detroit Police Department, which provided, in relevant part, as follows:

---

[3] Recognizing that the rights granted defendants by the Detroit Police Department in its advice-of-rights form are extremely broad, this Court asked the parties to brief a question not previously raised by either party: "whether the [advice-of-rights form] signed by the defendants bar[s] the use of their statements in a criminal prosecution as violative of state or federal rights against self-incrimination." *People v Harris*, 497 Mich 958 (2015).  We need not address this issue because the case is fully resolved under the DLEOA.

4

It is my belief . . . that this Statement and the Preliminary Complaint Report will not and cannot be used against me in any subsequent proceedings other than disciplinary proceedings within the confines of the Department itself. For any and all other purposes, I hereby reserve my Constitutional rights to remain silent under the **FIFTH** and **FOURTEENTH AMMENDMENTS** [sic] to the **UNITED STATES CONSTITUTION**, and Article I, Section 17 **of the MICHIGAN CONSTITUTION**.

All three defendants made false statements at the *Garrity* hearing. Defendants Harris and Little denied that Hughes had any physical contact with Hodges-Lamar. Hughes admitted that he removed Hodges-Lamar from Hodges-Lamar's car during questioning, but Hughes maintained that he did not use any unnecessary force against Hodges-Lamar. A video recording of the incident surfaced after defendants had made their statements. The video recording was provided to the OCI.[4]

The video recording is wholly at odds with the statements provided by defendants. The prosecutor charged Hughes with common-law felony misconduct in office, MCL 750.505, misdemeanor assault and battery, MCL 750.81, and obstruction of justice, also under MCL 750.505. Defendants Harris and Little were each charged with one

---

[4] The video showed defendant Hughes approach Hodges-Lamar's vehicle while defendants Harris and Little assumed positions at the rear of the vehicle and the passenger door. Hughes pulled Hodges-Lamar out of the vehicle by his collar, slammed him against the car, and searched him. Meanwhile, Harris and Little had moved closer to Hughes and Hodges-Lamar. Hughes pushed Hodges-Lamar toward Harris and Little. Finally, Hughes can be seen striking Hodges-Lamar with an open hand in the throat, punching him again, pushing him to the ground, picking him up by the collar several times, slamming him onto the car, and pushing him back toward Harris and Little. Afterward, Hodges-Lamar was issued a citation for driving without proof of insurance.

5

count of common-law obstruction of justice, MCL 750.505. The obstruction-of-justice charges were based on allegations that the officers lied during the initial investigation.

Defendants brought motions in district court to dismiss the obstruction-of-justice charges.[5] The district court concluded that defendants' statements were protected by the DLEOA, even if the information provided was false or misleading. The court determined that without defendants' statements the obstruction-of-justice charges could not be sustained and dismissed those charges. The prosecution appealed in the circuit court, which concluded that the district court had not abused its discretion by dismissing the obstruction-of-justice charges.

The prosecution filed applications for leave to appeal in the Court of Appeals with regard to all three defendants. In a published opinion, a divided panel reversed the lower courts and reinstated the obstruction-of-justice charges.[6] The majority recognized that its holding conflicted with *People v Allen*,[7] which held that "the Fifth and Fourteenth Amendments' benefits of freedom from [a] coerced waiver of the right to remain silent . . . must be respected," even in a subsequent perjury prosecution. After noting that *Allen* was not binding precedent under MCR 7.215(J)(1), the majority concluded that "in light of the post-*Garrity* caselaw permitting a witness's statements to be used against him

---

[5] Defendant Hughes did not challenge the bindover regarding his common-law felony misconduct in office and misdemeanor assault and battery charges. As a result, those charges are not at issue on appeal.

[6] *People v Hughes*, 306 Mich App 116; 855 NW2d 209 (2014).

[7] *People v Allen*, 15 Mich App 387, 396; 166 NW2d 664 (1968).

6

or her in a subsequent criminal prosecution for a collateral offense such as perjury or obstruction of justice, we expressly disavow *Allen*'s reasoning."[8] The majority further concluded that "[t]he district court . . . abused its discretion by excluding defendants' false statements under MCL 15.393 . . . ."[9] The majority reasoned that "the statute internally limits the phrase 'involuntary statement' to include true statements only, and that false statements and lies therefore fall outside the scope of the statute's protection."[10]

Judge WILDER dissented from the majority's determination that false statements fall outside the DLEOA's scope of protection. Relying on the plain meaning of the words of the act, Judge WILDER reasoned that the protection granted law enforcement officers under the DLEOA applies to all information garnered from an officer during a compulsory internal police investigation.

Defendants filed separate applications for leave to appeal in this Court, each arguing that the Court of Appeals majority erred by concluding that the DLEOA's scope of protection did not encompass defendants' false statements. On February 4, 2015, we granted the applications, directing the parties to brief "whether the Disclosures by Law Enforcement Officers Act, MCL 15.391, *et seq*., precludes the use of false statements by a law enforcement officer in a prosecution for obstruction of justice[.]"[11]

---

[8] *Hughes*, 306 Mich App at 128.

[9] *Id.*

[10] *Id*. at 129.

[11] *Harris*, 497 Mich 958.

7

## II. STANDARD OF REVIEW

We review de novo constitutional issues and matters of statutory interpretation.[12]

## III. ANALYSIS

We must determine whether Michigan law provides these defendants with more protections than those provided under the Fifth Amendment of the United States Constitution.[13] While we touch on the constitutional right against self-incrimination found in the Fifth Amendment and the corresponding provision of the Michigan Constitution, this case does not turn on those constitutional provisions. Defendants do not maintain the protection they seek comes from *Garrity* or its progeny under federal or Michigan caselaw.[14] Rather, defendants argue that the Legislature, in enacting the DLEOA, chose to afford law enforcement officers greater protection than that available

---

[12] *People v McKinley*, 496 Mich 410, 414-415; 852 NW2d 770 (2014).

[13] See *Malloy v Hogan*, 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964), which applied the Fifth Amendment protection against self-incrimination to the states through the Fourteenth Amendment.

[14] Many cases have developed *Garrity* into the rule as it is understood today. As is particularly relevant to this opinion, the Supreme Court of the United States has clarified, since *Garrity*, that its interpretation of the Fifth Amendment only applies to truthful statements. See, e.g., *United States v Wong*, 431 US 174; 97 S Ct 1823; 52 L Ed 2d 231 (1977); *United States v Apfelbaum*, 445 US 115; 100 S Ct 948; 63 L Ed 2d 250 (1980).

As the Court of Appeals correctly observed, however, Michigan caselaw has not expressly kept pace with this federal development of the *Garrity* rule. The last published authority on the topic came from *Allen*, 15 Mich App 387, which concluded that *Garrity* applies to false statements; *Allen* was not directly repudiated by a Michigan court until the Court of Appeals' opinion in this case. The parties do not challenge this repudiation and, given the developments in *Garrity* jurisprudence in the time since *Allen* was issued, we see no reason to disturb it.

under the Fifth Amendment and that statutory protection requires dismissal of the obstruction-of-justice charges brought against them. This protection, defendants argue, is found in the plain language of the DLEOA, specifically MCL 15.393, which provides:

> An involuntary statement made by a law enforcement officer, and any information derived from that involuntary statement, shall not be used against the law enforcement officer in a criminal proceeding.

The DLEOA defines the term "involuntary statement" as follows:

> "Involuntary statement" means information provided by a law enforcement officer, if compelled under threat of dismissal from employment or any other employment sanction, by the law enforcement agency that employs the law enforcement officer.[15]

The prosecution argues this language does not preclude the use in later criminal proceedings of false or misleading information obtained through a *Garrity* hearing. The prosecution characterizes the language as nothing more than a codification of the *Garrity* rule as it has been developed through federal caselaw. Thus, the prosecution argues that the DLEOA only provides the protection afforded under the Fifth Amendment. Because the Supreme Court of the United States has made it clear that the Fifth Amendment grants a privilege to remain silent without consequence, but "does not endow the person who testifies with a license to commit perjury,"[16] the prosecution maintains that the DLEOA does not protect from subsequent criminal prosecution a law enforcement officer who provides false or misleading statements in a *Garrity* hearing.

---

[15] MCL 15.391(a).

[16] *Wong*, 431 US at 178 (citation and quotation marks omitted).

9

The plain language of the DLEOA controls our resolution of this dispute and compels us to agree with defendants. Applying traditional principles of statutory construction to the language of the DLEOA, we must conclude that the act sweeps within its scope the false statements offered by defendants. While we may question the Legislature's decision to offer such unqualified protections, we are obligated to respect that decision and interpret the statute in accordance with its plain language.

## A. THE DLEOA'S PROTECTIONS REACH BOTH TRUE AND FALSE STATEMENTS

Our primary focus in this case—and all cases in which we are called upon to interpret a statute—is the language of the statute under review. The words of the statute provide the best evidence of legislative intent and the policy choices made by the Legislature.[17] Our role as members of the judiciary is not to second-guess those policy decisions or to change the words of a statute in order to reach a different result. In fact, a "clear and unambiguous statute leaves no room for judicial construction or interpretation."[18] Therefore, we start by examining the words of the statute, which "should be interpreted on the basis of their ordinary meaning and the context within which they are used in the statute."[19]

---

[17] *White v Ann Arbor*, 406 Mich 554, 562; 281 NW2d 283 (1979).

[18] *Coleman v Gurwin*, 443 Mich 59, 65; 503 NW2d 435 (1993).

[19] *People v Zajaczkowski*, 493 Mich 6, 13; 825 NW2d 554 (2012).

The Legislature chose to use broad language in the DLEOA. The act prohibits any information derived from an involuntary statement from being used against the officer in a criminal proceeding,[20] and also prohibits public access to and disclosure of an involuntary statement, except under certain, statutorily enumerated circumstances.[21] The act does not expressly limit the statute's protections to true statements, nor does it contain any express exception for perjury, lying, providing misinformation, or similar dishonesty. In contrast, numerous statutes concerning the use of compelled testimony contain express exceptions to allow the use of such dishonest testimony for impeachment purposes and in prosecutions for perjury.[22] The Court of Appeals inferred the existence of such a limitation in the DLEOA from the Legislature's use of the term "information." While we agree that "information" comprises statements that are true, the word does not exclude statements that are false.

The word "information" is not defined in the statute, but dictionaries define the word broadly as "knowledge communicated or received concerning a particular fact or circumstance";[23] "[k]nowledge or facts communicated about a particular subject, event, etc.; intelligence, news";[24] and "the communication or reception of knowledge or

---

[20] MCL 15.393.

[21] MCL 15.395.

[22] See, e.g., MCL 780.702(3); MCL 750.157; MCL 750.453.

[23] *Random House Webster's College Dictionary* (2003).

[24] 1 *Shorter Oxford English Dictionary* (6th ed).

11

intelligence[.]"[25]   The dissent focuses its attention on "knowledge," but "intelligence"

and "news," both of which are used in dictionaries to describe "information," can be

false.[26]   Even "knowledge" can be defined to include "the sum of what is known,"[27]

which does not foreclose the possibility of including something that is false.

We may even conclude that "knowledge" in its primary sense encompasses

something that is true.  But the *statute* nowhere uses the term "knowledge."  Instead, it

protects "statements," which no one disputes may be false and are statutorily defined as

"information."   The critical inquiry is not whether "knowledge" equals "truth," but

whether "information" connotes *only* truth.  Dictionaries, which define "information" as

"knowledge," "intelligence," or "news," do not yield a dispositive answer.

Keeping in mind that we must interpret the word "information" as used in the

DLEOA "according to the common and approved usage of the language,"[28] we apply a

tool that can aid in the discovery of "how particular words or phrases are actually used in

---

[25] *Merriam-Webster's Collegiate Dictionary* (11th ed).

[26] See *Random House Webster's College Dictionary* (2003) (defining "intelligence" as "information received or imparted; news," and defining "news" as "a report of a recent event; information").

[27] *Id.*

[28] MCL 8.3a.

12

written or spoken English."[29]  The Corpus of Contemporary American English (COCA)[30] allows users to "analyze[] ordinary meaning through a method that is quantifiable and verifiable."[31]

The dissent claims that, in ordinary usage, "we should not think of someone who provided inaccurate statements as having imparted 'knowledge' or 'information' . . . ."[32] Empirical data from the COCA, however, demonstrates the opposite.  In common usage, "information" is regularly used in conjunction with adjectives suggesting it may be both true and false.[33]  This strongly suggests that the unmodified word "information," can

---

[29] *State v Rasabout*, 2015 Utah 72, ¶ 57; 356 P3d 1258 (2015) (Lee, A.C.J., concurring in part).  Linguists call this type of analysis *corpus linguistics*, but the idea is consistent with how courts have understood statutory interpretation.  For instance, the United States Supreme Court has looked to Westlaw and Lexis databases to examine how words are used in ordinary English when examining how Congress intended a particular word or phrase.  See *Texas Dep't of Housing & Community Affairs v Inclusive Communities Project, Inc*, 576 US ___, ___; 135 S Ct 2507, 2534; 192 L Ed 2d 514 (2015) (Alito, J., dissenting); *Muscarello v United States*, 524 US 125, 129; 118 S Ct 1911; 141 L Ed 2d 111 (1998).

[30] The Corpus of Contemporary American English contains over 520 million words from 220,225 texts, spread evenly among a 25-year period, 1990-2015.  The texts include transcripts of live television broadcasts, newspapers, magazines, academic journals, and fiction.  Corpus of Contemporary American English, *Texts* <http://corpus.byu.edu/coca/help/texts.asp> (accessed June 6, 2016) [https://perma.cc//E77D-97XR].

[31] Mouritsen, *Hard Cases and Hard Data: Assessing Corpus Linguistics as an Empirical Path to Plain Meaning*, 13 Colum Sci & Tech L Rev 156, 202 (2012).

[32] *Post* at 9 n 11.

[33] In conducting a COCA search, the word "accurate" is the most common adjective collocated with "information" to bear a meaning that refers to truth or falsity.  The words "false" and "inaccurate" are also commonly collocated with "information."  The

13

describe *either* true or false statements.  Moreover, by reading each identified use of the word "information" in its surrounding context,[34] it is clear that "information" is often used to describe false statements.[35]  Quite simply, "information" in common parlance describes perceptions conveyed about the world around us, which may be true or false.[36]

The Court of Appeals failed to account for the breadth and scope of the word "information."  We therefore cannot agree that the lay definitions of "information" exclude the falsehoods offered by defendants, or that the Legislature, by merely using

---

collocation search for "information" is available at Corpus of Contemporary American English, *"Information" Frequency* <http://corpus.byu.edu/coca/?c=coca&q=47913597> (accessed June 6, 2016).

[34] *See Hard Cases and Hard Data*, 13 Colum Sci & Tech L Rev at 197.  This is known as a concordance search.  After running a collocation search, a user can retrieve the results of a concordance search by navigating to a collocated word and examining each listing in its full context.

[35] For example, news stories from 2006—the year the Legislature enacted the DLEOA— describe "heightened publicity about false information on" the Internet and market analysts "who say they witnessed fellow employees allowing hedge fund clients . . . to add false or misleading information" to investment reports.  Hafner, *Growing Wikipedia Refines Its 'Anyone Can Edit' Policy*, New York Times (June 17, 2006); Masters, *2 Firms Claim Conspiracy in Analyst Reports*, The Washington Post (April 26, 2006).

[36] The fact that "information" is often used without a modifying adjective to distinguish its veracity does not, as argued by the dissent, indicate that the word "information" connotes the conveyance of only truthful information.  The absence of a modifying adjective around the word is immaterial; the word is used to describe perceptions about the world around us, which may be "true, false, and in-between."  Schieffer, CBS News, *The Spread of Measles—And of Lies on the Internet* <http://www.cbsnews.com/news/the-spread-of-measles-and-of-lies-on-the-internet/> (posted February 8, 2015) (accessed June 6, 2016) [https://perma.cc/F4XK-9PAE].

that word, intended to impose an inherent requirement of veracity for involuntary statements to be covered under the DLEOA.[37]

To the contrary, examination of the Legislature's use of "information" in other statutes that existed at the time the DLEOA was enacted leaves no doubt that the unmodified term is properly construed to apply to *all* "information," whether true or false. In the years leading up to enactment of the DLEOA, the Legislature frequently modified the word "information" with the word "truthful" when it intended to reach only truthful information. Such an express limitation, found in a number of other statutes, including in statutes involving immunity or compelled statements,[38] is not present here.[39]

---

[37] We see little interpretive import in comparing "information" with "misinformation" and, in light of the definitions discussed in this opinion, are inclined to agree with Judge WILDER's dissent that the latter is merely a subset of the former. Indeed, as already explained, a collocation and concordance search on COCA demonstrates that the word "information" is often modified by words connoting veracity, such as "accurate."

[38] In addition to MCL 780.702 and MCL 750.157, discussed subsequently in the main text of this opinion, see, e.g., MCL 750.453 ("Truthful testimony, evidence, or other truthful information compelled under this section and any information derived directly or indirectly from that truthful testimony, evidence, or other truthful information shall not be used against the witness in a criminal case, except for impeachment purposes or in a prosecution for perjury or otherwise failing to testify or produce evidence as required."); MCL 29.7(4) (expressly protecting only "truthful testimony" and "truthful information" from being used against a witness); MCL 780.702a(6) (stating that "truthful information" compelled under an order granting immunity may not be used against a witness); MCL 750.125(5) (expressly protecting "truthful information" from being used against a witness); MCL 750.122(2) (stating that paying a witness's reasonable costs to "testify truthfully or provide truthful information" is not a crime).

[39] See also MCL 333.17014 (stating that certain informed consent statutes are designed to provide "objective, truthful information"); MCL 400.111b(20) (requiring certain professionals to provide "truthful information" about their qualifications).

15

Of particular relevance is MCL 780.702(3), which governs orders granting immunity to witnesses. The statute expressly limits immunity to "[t]ruthful testimony or other *truthful information* compelled under the order granting immunity . . . ."[40] Although the statute was first enacted into law in 1968, its limitation of immunity to only truthful information was not present in the statute until 1999—seven years before the Legislature enacted the

---

Other statutes do not modify the word "information" with "truthful," but still suggest that "information" has no inherent connotation of veracity. See, e.g., MCL 423.452(b) (denying a presumption of actions in good faith to employers who disclose employee information "with a reckless disregard for the truth"); MCL 380.1230b (same quoted language as MCL 423.452(b)); MCL 750.411s(8)(i) (" 'Post a message' means . . . communicating or attempting to . . . communicate information, whether truthful or untruthful, about the victim."); MCL 449.20 (requiring that "[p]artners shall render on demand true and full information of all things affecting the partnership to any partner or the legal representative of any deceased partner or partner under legal disability"); MCL 449.1305(2) (setting forth the right of limited partners to "[o]btain from the general partners, from time to time, upon reasonable demand . . . true and full information regarding the state of the business and financial condition of the limited partnership"); MCL 324.5507(1)(e) (requiring that a certain application be accompanied by a certification "stat[ing] that, based on information and belief formed after reasonable inquiry, the statements and information in the application are true, accurate, and complete"); MCL 460.1093(9) (requiring that a certain report "shall be accompanied by an affidavit from a knowledgeable official of the customer that the information in the report is true and correct to the best of the official's knowledge and belief").

Correspondingly, as Judge WILDER observed in dissent, the Legislature has frequently modified "information" with the adjectives "misleading" or "inaccurate" when the Legislature only intended to reach false information. See, e.g., MCL 769.34(10); MCL 750.492a(1); MCL 791.235(1)(b). We agree with Justice MARKMAN that the use of such modifiers in other statutes does not alone lead to the conclusion that the word "information," as used in the DLEOA, includes both true and false statements. But the Legislature's use of these modifiers elsewhere supports our understanding that the word "information" itself connotes nothing with respect to veracity.

[40] MCL 780.702(3) (emphasis added).

16

DLEOA.[41] Similarly, MCL 750.157 prevents certain compelled "[t]ruthful testimony, evidence, or other *truthful* information" from being used against the person "in a criminal case, except for impeachment purposes or in a prosecution for perjury . . . ."[42]

The presence of the word "truthful" in these statutes is linked to this Court's ruling in *People v McIntire*[43]—a 1999 opinion we find instructive and supportive of our analysis here. At issue in *McIntire* was the proper interpretation of transactional immunity for witnesses compelled to answer potentially incriminating questions under MCL 767.6. The statute at the time provided, in relevant part, that "[n]o person required to answer such questions shall thereafter be prosecuted for any offense concerning which such answers may have tended to incriminate him."[44] In light of this plain language, the *McIntire* Court rejected the notion that a grant of immunity under MCL 767.6 extended only to truthful answers, reasoning that the text of the statute was "clear and unambiguous" and "simply [did] not condition . . . immunity on *truthful* testimony."[45] In so holding, this Court stressed that it was bound—as we are here—by "traditional principles of statutory construction," which require courts to "respect the constitutional role of the Legislature as the policy-making branch of government and constrain the

---

[41] Compare 1968 PA 289, § 2, with 1999 PA 249, § 2.

[42] Emphasis added.

[43] *People v McIntire*, 461 Mich 147; 599 NW2d 102 (1999).

[44] MCL 767.6, as amended by 1951 PA 276.

[45] *McIntire*, 461 Mich at 154 (citation and quotation marks omitted).

17

judiciary from encroaching on this dedicated sphere of constitutional responsibility."[46] The Legislature received this message and subsequently amended MCL 767.6 and other statutes accordingly, adding "truthful" to terms such as "testimony" and "information" when the Legislature sought to add that limitation.

The Legislature clearly knows how to limit information based on its veracity when such a limitation is important to conveying its intent. It did so in a number of other statutes it enacted or amended after *McIntire*, but it chose not to do so in the DLEOA, even though the Legislature had the benefit of *McIntire* when it enacted the DLEOA in 2006. We cannot overlook this choice, or refuse to give it effect.[47] Accordingly, we

---

[46] *Id.* at 153 (citation and quotation marks omitted).

[47] See, e.g., *Farrington v Total Petroleum, Inc*, 442 Mich 201, 210; 501 NW2d 76 (1993) ("Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there."); *Paselli v Utley*, 286 Mich 638, 643; 282 NW 849 (1938) ("This court cannot write into the statutes provisions that the legislature has not seen fit to enact.").

In his dissent, Justice MARKMAN questions our reliance on *McIntire* by suggesting that *McIntire* has since been rendered moot. We find no support for that suggestion. To the contrary, *McIntire* guides our decision by interpreting a similar statute. The *McIntire* Court recognized—as we do here—that a court is not free to rewrite a statute because the end result may be subjectively unpalatable, and that "the object of judicial statutory construction is not to determine whether there are valid *alternative* policy choices that the Legislature may or should have chosen, but to determine from the text of the statute the policy choice the Legislature *actually* made." *McIntire*, 461 Mich at 157 (citation and quotation marks omitted). The *McIntire* Court concluded that the statutory language at issue in that case unambiguously stated the Legislature's actual policy choice and that there was no basis to disregard that choice "to further policy concerns that [a court], but apparently not the Legislature, prefers." *Id*. at 160 (citation and quotation marks omitted). We are still obligated to give weight to the Legislature's decision not to modify "information" in the DLEOA with "truthful" or to impose any other veracity-based limitation on the scope of the statute's protections.

18

conclude that the Legislature intended the word "information," as used in MCL 15.391, to include no inherent requirement of veracity, but instead to include statements that may be true or false.[48]

---

This Court's decision in *McIntire* coupled with the unique history of immunity statutes in Michigan leads us to the conclusion that the DLEOA protects both true and false statements. The dissent would have us abandon *McIntire* in favor of the federal rule articulated in *Glickstein v United States*, 222 US 139, 142; 32 S Ct 71; 56 L Ed 128 (1911). Whatever the merits of that rule, the existence of *McIntire* at the time the DLEOA was enacted provides us great insight into the intent of the Legislature. Accordingly, we see no reason to abandon *McIntire* now. *See Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000). We nonetheless recognize that *McIntire* guides us in the limited and unique area of immunity-related statutes and we express no opinion whether other statutes that incorporate the word "information" in an entirely different context outside that of immunity and compulsory statements might be interpreted differently.

[48] In urging against this result, the prosecution contends that the DLEOA's legislative history makes clear that MCL 15.393 was meant to codify nothing more than the Fifth Amendment protections recognized by *Garrity* and its federal progeny—a contention Justice MARKMAN also notes. We find this line of argument unavailing for several reasons. First, for the reasons already discussed, the plain language of MCL 15.393 controls our analysis and belies this interpretation, making clear that the statute's protections extend beyond those presently guaranteed by the Fifth Amendment. We see no need or place for legislative history in this analysis. Second, the materials offered by the prosecution are legislative analyses, which this Court has recognized to be of little use in discerning the intent of the Legislature. See *Johnson v Recca*, 492 Mich 169, 188; 821 NW2d 520 (2012) (stating that a house legislative analysis, which is a staff-prepared summary of the law, is entitled to little judicial consideration in the construction of statutes); *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 587; 624 NW2d 180 (2001) ("[A] legislative analysis is a feeble indicator of legislative intent . . . ."); *In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003) ("In no way can a 'legislative analysis' be said to officially summarize the intentions of those who have been designated by the Constitution to be participants in this legislative process, the members of the House and Senate and the Governor. For that reason, legislative analyses should be accorded very little significance by courts when construing a statute."). And third, these analyses offer no direct insight into the precise scope of the intended codification of *Garrity*, or whether

MCL 15.393 was meant to afford protection beyond it. Indeed, it is not even clear whether the drafters of the analyses believed the statute was meant to codify *Garrity* as its rule had been interpreted by the Michigan Court of Appeals in *Allen*—which would render defendants' statements constitutionally protected—or instead to codify *Garrity* as its rule had been developed by subsequent federal caselaw—which would afford no constitutional protection to those statements. Simply put, we see nothing of interpretive use in these materials, or of persuasive value in the prosecution's arguments based on them.

Although the parties did not address the question, Justice MARKMAN also offers another interpretive avenue for constraining the scope of the DLEOA's protections to those constitutionally provided under *Garrity* and its federal progeny: he suggests that "truthful" need not be included with "information" in the DLEOA because, as federal Fifth Amendment jurisprudence has held, an individual cannot be compelled to lie; accordingly, even if a lie can be deemed "information," lies cannot be considered an "involuntary statement" or "compelled" within the meaning of the DLEOA. While we recognize the intuitive appeal of this reasoning, we find ourselves unable to square it with *McIntire* and the numerous instances, previously cited in this opinion, in which the Legislature has described "information" as *both* "truthful" and "compelled." See MCL 780.702(3) (referring to "[t]ruthful testimony or other truthful information compelled under the order granting immunity"); MCL 750.157 (referring to "[t]ruthful testimony, evidence, or other truthful information compelled under this section"). If nothing else, these instances make clear that, by the time the DLEOA was enacted, the Legislature was not assuming that the term "compelled" would be inherently limited to its Fifth Amendment meaning, or would express an intent to reach only truthful statements. Nor do we discern such a limitation in the term itself, or view false statements as necessarily voluntary. Indeed, in *Allen*, the Court of Appeals rejected the contention that a false statement cannot be voluntary by observing that "what one reveals as a result of a waiver is of no import in determining whether the waiver was voluntary or coerced." *Allen*, 15 Mich App at 393. In this case, there is no question that, but for the threat of termination, defendants in this case would have remained silent. Again, the advice of rights form presented to defendants by the Detroit Police Department stated, "If I refuse . . . to answer questions . . . , I will be subject to departmental charges which could result in my dismissal from the police department," and "[i]f I do answer . . . , neither my statements or any information or evidence which is gained by reason of such statements can be used against my [sic] in any subsequent criminal proceeding."

20

## B. THE PLAIN LANGUAGE OF THE DLEOA REQUIRES DISMISSAL OF THE OBSRUCTION-OF-JUSTICE CHARGES

Applying this interpretation of the DLEOA's plain language, the obstruction-of-justice charges brought against defendants must be dismissed. Defendants provided statements regarding their encounter with Mr. Hodges-Lamar under threat of termination; these statements, though false, are protected by the DLEOA and, therefore, cannot be used against defendants in a criminal proceeding. There is no dispute that defendants' statements provided the only basis for charging them with obstruction of justice and that if this evidence is inadmissible, the charges must be dismissed. According to the Court of Appeals majority, however, this outcome must be rejected because it is "wholly contrary to the Legislature's purpose in enacting the [DLEOA]," which "was to create a mechanism for facilitating internal police investigations and to provide an incentive for officers who cooperate by providing needed facts."[49] Justice MARKMAN now echoes this sentiment in dissent, concluding that "[n]o Legislature, and no legislator, could conceivably have intended such a result."[50]

We understand how this result may be viewed as unpalatable. But as this Court has long made clear, our statutory analysis is controlled by principles of interpretation, not palatability of outcomes. It is not our role to rewrite the law or substitute our own policy judgment in the face of the text of the statute, or "to create an ambiguity where

---

[49] *Hughes*, 306 Mich App at 130.

[50] *Post* at 28. In so stating, Justice MARKMAN implicitly suggests that our interpretation of the DLEOA renders an absurd result. A similar argument was raised in *McIntire* and was rejected by this Court.

21

none exists in order to reach a desired result, albeit one with which [we] might wholeheartedly agree [if we were legislators] authorized to enact policy."[51]

For the reasons discussed in this opinion, we discern from the plain language of the DLEOA a legislative intent to protect all *Garrity* statements, regardless of their veracity. And while there may be ample room to question the wisdom of such unqualified statutory protections, we see no principled basis for this Court to ignore or reject the Legislature's enactment of them.

We do not view recognition of these unqualified protections as absurd or flatly at odds with the purpose of the DLEOA. There is seemingly no dispute that the protections offered by the DLEOA are intended to encourage and facilitate officers' participation in internal investigations, with the goal of rendering those investigations more fruitful and effective. As the plain language of the DLEOA makes clear, the Legislature deemed this purpose best served by not limiting the statute's protections only to statements that are true. Regardless of whether we agree with this policy determination, we can conceive of reasons for it. The Legislature may very well have viewed the benefit of such a limitation—namely, the ability to criminally prosecute officers for lies told during an internal investigation—as outweighed by its costs. Not all statements, after all, are clearly true or entirely false, and the Legislature may have concluded that qualifying the DLEOA's statutory protections based on veracity would unduly complicate the

_____

[51] *McIntire*, 461 Mich at 153 (citation and quotation marks omitted; alterations in original).

22

implementation of those protections[52] or undermine the certainty and effectiveness of the protections offered. Indeed, the Allen court observed that the exception to protection for perjured statements is "more precisely stated" as an exception to protection "where the prosecuting authority *charges* perjury,"[53] a broader scope encompassing prosecutorial discretion and requiring the *jury* to ultimately decide the falsity of a statement. The Legislature may have reasoned—for better or worse—that it was more beneficial to punish the lies uncovered during the course of internal investigations with internal discipline.[54] We fail to see the absurdity in such reasoning, particularly given that the Legislature knows how to, and does, modify the term "information" with "truthful" when it intends to bring only truthful information within the scope of its legislation. And, as this Court stressed in *McIntire*,[55] we need not be sure of the precise reasons for a statutory judgment or be convinced of the wisdom of the legislation.

---

[52] As noted earlier, the DLEOA not only prohibits the use of involuntary statements in criminal proceedings, but also restricts their public disclosure. Complications could arise from a nondisclosure rule that turns on a determination of truth; who, for instance, would decide whether an officer's statement was truthful? The DLEOA provides no insight into how such a rule might be implemented.

[53] *Allen*, 15 Mich App at 393.

[54] We also note that the DLEOA does not purport to wholly foreclose criminal prosecution for an officer's conduct that has been the subject of internal inquiry; it simply prohibits using in that prosecution the officer's "involuntary statement" and "any information derived" therefrom. MCL 15.393.

[55] *McIntire*, 461 Mich at 159.

23

> [I]n our democracy, a legislature is free to make inefficacious or even unwise policy choices. The correction of these policy choices is not a judicial function as long as the legislative choices do not offend the constitution. Instead, the correction must be left to the people and the tools of democracy: the ballot box, initiative, referendum, or constitutional amendment.[56]

This statement applies with equal force in the present case. The plain language of the DLEOA protects all statements given by officers under compulsion. This choice may seem odd, or reflective of questionable or even bad public policy, but it was the Legislature's choice to make. We are not empowered to displace what the law actually provides with a judicial preference for what we believe it should provide.

## IV. CONCLUSION

In sum, the Legislature chose not to protect only truthful information when it enacted the DLEOA. This is demonstrated by the plain language of the statute when contrasted with the Legislature's known capacity to expressly limit the word "information" based on veracity in other statutes when such a limitation is critical to the Legislature's intent. Accordingly, we must conclude that the DLEOA prohibits the use of an officer's *Garrity* statement, even if false, in a criminal proceeding, including one for perjury or obstruction of justice. The Court of Appeals erred by concluding otherwise. We reverse the judgment of the Court of Appeals to the extent it held that, under the DLEOA, a law enforcement officer's involuntary statement could be used

---

[56] *Id.* (quotation marks and citations omitted).

24

against him or her in a criminal proceeding if the statement was false. We reinstate the orders entered in the district court that dismissed the obstruction-of-justice charges brought against defendants.

Brian K. Zahra
Robert P. Young, Jr.
Bridget M. McCormack
Richard H. Bernstein
Joan L. Larsen

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                     No. 149872

SEAN HARRIS,

       Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                     No. 149873

WILLIAM LITTLE,

       Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                     No. 150042

NEVIN HUGHES,

       Defendant-Appellant.

_____

MARKMAN, J. (*concurring in part and dissenting in part*).

I agree with the majority opinion to the extent that it holds that the Fifth Amendment does not preclude the use of false statements by a law enforcement officer in a prosecution for obstruction of justice. However, I respectfully disagree with it to the extent that it holds that the disclosures by law enforcement officers act (DLEOA), MCL 15.391 *et seq.*, precludes the use of false statements by a law enforcement officer in a prosecution for obstruction of justice. That is, contrary to the majority, I agree with the Court of Appeals that false statements do not constitute "information" and therefore are not protected by the DLEOA, which only protects "information." Accordingly, I would affirm the judgment of the Court of Appeals.

## I. FACTS AND HISTORY

The defendant police officers, Sean Harris, William Little, and Nevin Hughes, were charged with obstruction of justice for lying during an internal investigation of Hughes, who had assaulted Dajuan Hodges-Lamar. The assault was video recorded by a security camera at a gas station.[1] Defendants argued that the Fifth Amendment and the DLEOA prohibit the prosecutor from using the statements they made during the investigation. Before defendants provided their statements, the investigating officer provided each with a standard departmental notification-of-constitutional-rights form. This form stated, in relevant part, "If I refuse . . . to answer questions . . . , I will be

---

[1] Defendants Harris and Little did nothing to aid the victim or to prevent the assault. Defendant Hughes was also charged with misconduct in office and assault and battery arising out of the assault on Hodges-Lamar, but those charges are not the subject of this appeal.

2

subject to departmental charges which could result in my dismissal from the police department," and "[i]f I do answer . . . , neither my statements or any information or evidence which is gained by reason of such statements can be used against my [sic] in any subsequent criminal proceeding."[2] Each defendant signed the form and then proceeded to lie, stating that defendant Hughes did not have any physical contact with Hodges-Lamar apart from a pat-down search. The video recording showed otherwise.

The district court dismissed the obstruction-of-justice charges on the basis that defendants' statements to the investigating officer could not be used against them under the DLEOA and the Fifth Amendment,[3] and the circuit court affirmed. In a published and split decision, the Court of Appeals reversed and reinstated the obstruction-of-justice charges against all three defendants, holding that neither the Fifth Amendment nor the DLEOA prohibits the prosecutor from using the statements made by defendants during the investigation. *People v Hughes*, 306 Mich App 116; 855 NW2d 209 (2014). Judge

---

[2] Defendants also signed a reservation-of-rights form, which was similar to the notification-of-constitutional-rights form. Defendants now argue that the waivers they signed bar the use of their statements. However, defendants never made this argument in the lower courts and this argument, therefore, was not addressed. Because defendants did not preserve this argument below, I would hold that it has been waived. *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008) ("[A] failure to timely raise an issue waives review of that issue on appeal.") (citation and quotation marks omitted).

[3] The district court was bound by *People v Allen*, 15 Mich App 387; 166 NW2d 664 (1968), which held that the Fifth Amendment protects false statements. The Court of Appeals subsequently observed in the instant case that "[g]iven the intervening developments in federal law, . . . the reasoning of *Allen* cannot stand." *People v Hughes*, 306 Mich App 116, 127; 855 NW2d 209 (2014). For the reasons discussed later, I agree.

3

WILDER concurred in part and dissented in part. He agreed with the majority that the Fifth Amendment does not prohibit the prosecutor from using defendants' statements, but concluded that the DLEOA does prohibit the prosecutor from using defendants' statements. This Court then granted defendants' applications for leave to appeal. *People v Harris*, 497 Mich 958 (2015).

## II. ANALYSIS

## A. THE FIFTH AMENDMENT

The Fifth Amendment provides that no person "shall be *compelled* in any criminal case to be a witness against himself . . . ." US Const, Am V (emphasis added); see also Const 1963, art 1, § 17.[4] In *Garrity v New Jersey*, 385 US 493; 87 S Ct 616; 17 L Ed 2d 562 (1967), several police officers were investigated by the New Jersey Attorney General for fixing traffic tickets. After having been warned that if they refused to answer questions they would be subject to removal from office, the officers answered the questions asked of them during the investigation. *Id*. at 494-495. The Court held that

---

[4] The parties here do not argue that the Michigan Constitution should be interpreted differently than the United States Constitution. Accordingly, I limit my constitutional analysis to the Fifth Amendment. See *People v Wyngaard*, 462 Mich 659, 671 n 10; 614 NW2d 143 (2000) ("We confine our analysis to the Fifth Amendment because defendant has not argued that art 1, § 17 provides broader protections."); see also *People v Tanner*, 496 Mich 199, 256; 853 NW2d 653 (2014) ("Although this Court need not interpret a provision of our Constitution in the same manner as a similar or identical federal constitutional provision, we are persuaded in the present instance, on the basis of our examination of Article 1, § 17, that the United States Supreme Court's interpretation of the Self-Incrimination Clause of the Fifth Amendment in [*Moran v Burbine*, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986)] constitutes the proper interpretation of Article I, § 17 as well.").

4

their answers were "compelled" within the meaning of the Fifth Amendment and therefore that the statements could not be used against them in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws. *Id*. at 497-500. The Court explained that "protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id*. at 500.[5]

However, in *United States v Wong*, 431 US 174, 179; 97 S Ct 1823; 52 L Ed 2d 231 (1977), the United States Supreme Court held that "the Fifth Amendment privilege does not protect perjury . . . ." Instead, "[i]t grants a privilege to remain silent without risking contempt, but it 'does not endow the person who testifies with a license to commit perjury.' " *Id*. at 178 (citation omitted). Therefore, the Court held that the defendant's false testimony was admissible in a subsequent perjury trial even though the defendant had provided the false testimony without being informed of her Fifth Amendment right to remain silent.[6] "[E]ven the predicament of being forced to choose between incriminatory

---

[5] However, "given adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment." *Lefkowitz v Turley*, 414 US 70, 84; 94 S Ct 316; 38 L Ed 2d 274 (1973). Such statements are now sometimes referred to as "*Garrity* statements."

[6] More specifically, the Court held that "a witness who, while under investigation for possible criminal activity, is called to testify before a grand jury and who is later indicted for perjury committed before the grand jury, is [not] entitled to have the false testimony suppressed on the ground that no effective warning of the Fifth Amendment privilege to remain silent was given." *Wong*, 431 US at 174-175, 178.

5

truth and falsehood, as opposed to refusing to answer, does not justify perjury." *Id*. at 178. "[B]y answering falsely the [defendant] took 'a course that the Fifth Amendment gave [defendant] no privilege to take.' " *Id*. at 178-179 (citation omitted). "Indeed, even if the Government could, on pain of criminal sanctions, compel an answer to its incriminating questions, a citizen is not at liberty to answer falsely." *Id*. at 180. "If the citizen answers the question, the answer must be truthful." *Id*.

Similarly, in *United States v Apfelbaum*, 445 US 115, 117, 131; 100 S Ct 948; 63 L Ed 2d 250 (1980), the United States Supreme Court held that the "proper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely," and thus "neither the [federal use-immunity] statute[7] nor the Fifth Amendment precludes the use of respondent's immunized testimony at a subsequent prosecution for making false statements . . . ." That is, "perjury prosecutions are permissible for false answers to questions following the grant of immunity" because "the Fifth Amendment privilege against compulsory self-incrimination provides no protection for the commission of perjury . . . ." *Id*. at 126-127. See also *McKinley v City of Mansfield*, 404 F3d 418, 427 (CA 6, 2005) ("As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation. However, *Garrity* does not preclude use of such statements in prosecutions for the

---

[7] The federal use-immunity statute, 18 USC 6002, provides that when a witness is compelled to testify over his or her claim of a Fifth Amendment privilege, "no testimony . . . may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

6

independent crimes of obstructing the public employer's investigation or making false statements during it.") (citation omitted); *id.* ("[T]he Fifth Amendment permits the government to use compelled statements obtained during an investigation if the use is limited to a prosecution for collateral crimes such as perjury or obstruction of justice.").

In light of this caselaw, it is clear that the Fifth Amendment does not protect a defendant from a subsequent prosecution for perjury or obstruction of justice predicated on false statements that the defendant made after having been granted immunity from prosecution.[8]  Therefore, defendants' false statements are not inadmissible under the Fifth Amendment.  As a result, I agree with the Court of Appeals that

> [t]he Fifth Amendment did not bar the admission of defendants' false statements in the instant prosecutions for obstruction of justice.  The district court abused its discretion by relying on the Fifth Amendment to exclude defendants' false statements from evidence.  [*Hughes*, 306 Mich App at 128.]

## B.  DLEOA

The Court of Appeals also held that the DLEOA does not bar admission of defendant's false statements, and again I agree.  MCL 15.393 of the DLEOA provides:

> An involuntary statement made by a law enforcement officer, and any information derived from that involuntary statement, shall not be used against the law enforcement officer in a criminal proceeding.[9]

---

[8] Indeed, defense counsel for defendant Little seemed to concede this at oral arguments before this Court.  Chief Justice YOUNG asked defense counsel, "The protection afforded by *Garrity* did not extend to lies made as a *Garrity* statement, correct?"  Defense counsel responded, "Absolutely correct[.]"

[9] In addition, MCL 15.395 provides, in pertinent part:

7

## 1.  "INFORMATION"

MCL 15.391 defines the term "involuntary statement" as "*information* provided by a law enforcement officer, if *compelled* under threat of dismissal from employment or any other employment sanction . . . ."  (Emphasis added.)  "Information" is defined as "**1.** knowledge communicated or received concerning a particular fact or circumstance; news.  **2.** Knowledge gained through study, communication, research, instruction, etc.; data; facts."  *Random House Webster's College Dictionary* (1992).[10]  In turn,

An involuntary statement made by a law enforcement officer is a confidential communication that is not open to public inspection.  The statement may be disclosed by the law enforcement agency only under 1 or more of the following circumstances:

(a) With the written consent of the law enforcement officer who made the statement.

(b) To a prosecuting attorney or the attorney general pursuant to a search warrant, subpoena, or court order, including an investigative subpoena issued under chapter VIIA of the code of criminal procedure, 1927 PA 175, MCL 767a.1 to 767a.9.  However, a prosecuting attorney or attorney general who obtains an involuntary statement under this subdivision shall not disclose the contents of the statement except to a law enforcement agency working with the prosecuting attorney or attorney general or as ordered by the court having jurisdiction over the criminal matter or, as constitutionally required, to the defendant in a criminal case.

[10] Similarly, "inform" means "to give or impart knowledge of a fact or circumstance to" or "to supply (oneself) with knowledge of a matter or subject[.]"  *Random House Webster's College Dictionary* (1992).  Lies do not "impart knowledge."  Indeed, one becomes increasingly *less* informed as the result of lies.  Consider, for example, the concept of "informed consent," which is defined as "a patient's consent to a medical or surgical procedure or to participation in a clinical study after being *properly* advised of the relevant medical facts and the risks involved."  *Id.* (emphasis added).  We would never state that a patient who consented to a medical procedure after being lied to about the relevant medical factors or risks in that medical procedure provided genuinely "*informed* consent."  Likewise, we should not here conclude that officers who lied about

8

"knowledge" is defined as "acquaintance with facts, *truths*, or principles[.]" *Id.* (emphasis added).[11] As the Court of Appeals explained:

> The phrase "involuntary statement" is defined as "*information provided by a law enforcement officer, if compelled under threat of dismissal from employment or any other employment sanction, by the law enforcement agency that employs the law enforcement officer.*" MCL 15.391(a) (emphasis added). But when an officer is compelled to make a statement during an internal investigation, and provides only misinformation and lies, he or she has not provided any "information" at all within the commonly understood meaning of that word. Among other things, "information" is defined as "knowledge communicated or received concerning a particular fact or circumstance." *Random House Webster's College Dictionary* (1997). The word "knowledge," in turn, is defined as "the body of truths or facts accumulated in the course of time." *Id.* Because an officer's lies do not impart any truths or facts, they necessarily do not constitute "information." See MCL 15.391(a).[12] In other words, an

---

misconduct nevertheless provided "information."

[11] Similarly, "knowledgeable" means "well-informed." *Random House Webster's College Dictionary* (1992). We do not think of someone who knows nothing accurate about a subject as being "knowledgeable" or "well informed" regarding that subject. Accordingly, we should not think of someone who provided inaccurate statements as having imparted "knowledge" or "information" in that regard.

[12] The majority concludes that the definitions of "information" and "knowledge" do not exclude statements that are false. However, all the definitions that the majority relies on *do*, in my opinion, exclude statements that are deliberately false, such as the ones at issue here. The majority relies on the following definitions of "information": "knowledge communicated or received concerning a particular fact or circumstance"; "[k]nowledge or facts communicated about a particular subject, event, etc.; intelligence, news"; and "the communication or reception of knowledge or intelligence[.]" (Citations and quotation marks omitted). In addition, the majority relies on the following definition of "knowledge": "the sum of what is known[.]" (Citation and quotation marks omitted). Each of these definitions strongly suggest that "information" and "knowledge" are things that are known, or at least believed, to be true at the time that they are communicated. However, when the officers *here* provided the statements at issue, they *knew* that their statements were *false*. That is, the officers "knew" that defendant Hughes assaulted Hodges-Lamar and yet they stated just the opposite. Thus, the officers' statements were

9

officer's lies and false statements do not qualify as "involuntary statement[s]" under MCL 15.393, and consequently may be used as evidence in a subsequent criminal prosecution. [*Hughes*, 306 Mich App at 129-130.]

Judge WILDER concurred with the Court of Appeals majority regarding the Fifth Amendment issue, but dissented on the statutory issue on the basis that lies constitute "information." As already explained, I agree with the Court of Appeals majority that lies do not constitute "information" as that term is commonly understood.[13] In other words, I do not believe most people would reasonably conclude that a person has provided them with "information" if all that the other person has done is tell them lies.[14]

---

very much at odds with their "information" or "knowledge" on the subject of what had occurred concerning Hodges-Lamar.

[13] Even putting aside the dictionary definitions this opinion cites, I do not believe that *any* ordinary or reasonable meaning of the word "information" includes false statements, and the majority identifies none. Would one person of a hundred taken at random from the streets of any community of this state disagree regarding this entirely ordinary meaning? And would it make the slightest difference whether any of them relied on a collegiate dictionary, a children's dictionary, a supermarket dictionary, an English-as-a-second-language dictionary, the Oxford English Dictionary, or no dictionary at all?

[14] The majority relies on the Corpus of Contemporary American English (COCA), a truly remarkable and comprehensive source of ordinary English language usage compiled by linguistic scholars at Brigham Young University, in particular Professor Mark Davies. The COCA, available at <http://corpus.byu.edu/coca/> (accessed June 7, 2016), is an online "resource [that can be used by courts] for assessing the ordinary meaning of a statutory term." *State v Rasabout*, 2015 Utah 72, ¶ 72; 356 P3d 1258 (2015) (Lee, A.C.J., concurring in part) (assessing with an impressive thoroughness, in ¶¶ 40-134, the strengths and limitations of using a corpus to facilitate the interpretive processes of the judiciary). By using the COCA, "we can access large bodies of real-world language to see how particular words or phrases are actually used in written or spoken English." *Id.* at ¶ 57. However, notwithstanding the majority's invocation of the COCA, I believe that the COCA actually supports the proposition set forth in this dissent that the common and most reasonable understanding of the term "information" excludes false statements. The term "information" is found within the COCA 168,187 times and yet it is only modified

by the term "truthful" 28 times, "true" 18 times, "accurate" 508 times, "inaccurate" 112 times, and "false" 271 times. In other words, the term "information" is modified by one of these adjectives 937 times. The other 167,250 times that the word "information" is used it is unmodified by one of these adjectives. That is, 99.44% of the time "information" in the COCA is unmodified by any of these adjectives related to veracity. Therefore, I disagree with the majority's contention that the COCA affords support for the proposition that the term "information" is "regularly" or "commonly" modified by one of these adjectives. I find to the contrary. And where "information" is *unmodified* by one of these adjectives, I believe it is overwhelmingly used to refer to truthful information. See, e.g., the utterly ordinary, commonplace, and pedestrian usages of "information" set forth in the COCA (among 167,248 others) at Morgenson, *Outside Advice on Boss's Pay May Not Be So Independent*, New York Times (April 10, 2006) ("The company operates Verizon's employee benefits Web sites, where its workers get information about their pay, health and retirement benefits, college savings plans and the like."); Anderson, *As Lenders, Hedge Funds Draw Insider Scrutiny*, New York Times (October 16, 2006) ("When a public company takes out a loan, it generally agrees to provide the lender with certain information, sometimes including monthly financial updates."). I do not believe that a judicial interpretation of "information" drawn from use of the term in ½ of 1% of all of its appearances in a corpus constitutes an ordinary, common, or reasonable interpretation of the term. There is no word that cannot be abused, misused, or employed in an exotic or puzzling way in everyday discourse, and a corpus will reflect this reality; it is not, however, the purpose of a corpus to transform every such use of a word into a reasonable construction of the words of the law. As Lincoln once remarked, "calling the tail [of a calf] a leg, [does] not make it a leg . . . ." 2 Burlingame, *Abraham Lincoln: A Life* (Baltimore: Johns Hopkins University Press, 2008), p 468 (citation and quotation marks omitted). Furthermore, the reader may wish to peruse at random any number of the 167,250 uses of "information" in the COCA and assess whether the term was reasonably used and understood as indistinguishably referring to true and false information. When, for example, the doctor is offered "information" from a patient concerning the latter's condition, would either party suppose that the latter was not intending in a reasonably accurate manner to describe his symptoms as he then believed them to be? Or, by further example, when a "contract" or "trade-off" of some kind is delineated by the elected representatives of the people in the Legislature, with an explicit quid pro quo defined in terms of the production of "information," and presumably with *some* measure of public benefit to be derived by the production of that "information," could that Legislature genuinely have been disinterested in whether such information was true or false?

11

Judge WILDER concluded that because "misinform" is defined as "giv[ing] false or misleading information," *Random House Webster's College Dictionary* (1997), "the term 'information' as used in MCL 15.393 must be interpreted to include the giving of 'misinformation.' " *Hughes*, 306 Mich App at 134 (WILDER, J., concurring in part and dissenting in part). I respectfully disagree. "Mis" is a prefix meaning the "opposite," "lack of," or negative of something. *Merriam Webster's Collegiate Dictionary* (11th ed).[15] Therefore, "misinformation" constitutes the "opposite" of "information," and because "misinformation" means "false or misleading information," it follows that "information" means true or accurate information.[16] Contrary to the contentions of Judge WILDER and now the majority in this Court, "misinformation" by its prefix signifies that it is *comparing itself* to "information;" it is not referring to a *subset*, a *type*, or a *class*, of "information."

Judge WILDER, and the majority in this Court, also rely on the fact that a number of Michigan statutes refer to "inaccurate" or "misleading" information. See, e.g, MCL 769.34(10); MCL 750.492a(1); MCL 168.467b(6); MCL 487.2140(2); MCL 791.235(1)(b). However, I believe that this actually supports the Court of Appeals

---

[15] See also *Random House Webster's College Dictionary* (1992), which defines "mis" as "a prefix applied to various parts of speech, meaning 'ill,' 'mistaken,' 'wrong,' 'wrongly,' 'incorrectly,' or simply negating: mistrial; misprint; mistrust."

[16] Similarly, "disinformation" means "false information deliberately and often covertly spread (as by the planting of rumors) in order to influence public opinion or obscure the truth," and the prefix "dis" means "[to] do the opposite of[.]" *Merriam Webster's Collegiate Dictionary* (11th ed).

majority's conclusion that "information" signifies truthful information because in those unusual circumstances in which the Legislature is intending to refer to untruthful information, it expressly refers to "inaccurate" or "misleading" information. That is, the Legislature recognizes that when it intends to refer to untruthful information, it needs to supply a modifier to precede "information" because, when unmodified, "information" signifies truthful information.[17] The Legislature's affirmative and specific references to "inaccurate" or "misleading" information in the previously cited provisions in contrast to the *absence* of such modifying terms in MCL 15.391 evidences its intention to limit the DLEOA's protection to "information," and what is ordinarily connoted by this term, and not to extend it to inaccurate or misleading information. See *Farrington v Total Petroleum, Inc*, 442 Mich 201, 210; 501 NW2d 76 (1993) ("Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there."); *Paselli v Utley*, 286 Mich 638, 643; 282 NW2d 849 (1938) ("This court cannot write into the statutes [protections] that the legislature has not seen fit to enact.").

---

[17] Judge WILDER also relied on the fact that MCL 15.393 refers to "*a* criminal proceeding," rather than *the* criminal proceeding. See MCL 15.393 ("An involuntary statement made by a law enforcement officer . . . shall not be used against the law enforcement officer in *a* criminal proceeding.") (emphasis added.) However, it would not make any sense for MCL 15.393 to refer to *the* criminal proceeding because at the time that a *Garrity* statement is given, there is no criminal proceeding to definitively identify by use of the definite article "the." Furthermore, the fact that the statute refers to "*a* criminal proceeding" rather than "*the* criminal proceeding" simply does not address the question at issue here-- whether an officer's *false* statements can be used against the officer "in a criminal proceeding."

13

The majority in this Court concludes that because the Legislature has modified the term "information" with the adjective "truthful" in other statutes, but not the instant one, it must have intended the term "information" in the instant statute to include both truthful and false information. That is, the Legislature obviously knew how to limit "information" to only "truthful information," and it chose not to limit "information" in that manner in the instant statute. Again, I respectfully disagree. The majority cites nine statutes that contain the phrase "truthful information."[18] However, six of those statutes were amended in the immediate aftermath of this Court's decision in *People v McIntire*, 461 Mich 147; 599 NW2d 102 (1999), which held that a witness did not have to answer questions truthfully in order to receive immunity under MCL 767.6. See MCL 29.7(4); MCL 750.157; MCL 750.453; MCL 750.125(5); MCL 780.702(3); MCL 780.702a(6). That is, in the immediate aftermath of *McIntire*, the Legislature inserted "truthful" into

_____

[18] These statutes will be discussed in greater detail in the main text of this opinion, but for context, I note that six of the statutes the majority relies on are either in the Michigan Penal Code or the Code of Criminal Procedure and one is in the Fire Prevention Code. These seven statutes provide that compelled, truthful information "shall not be used against the witness in a criminal case, except for impeachment purposes or in a prosecution for perjury," with the exception of MCL 750.122(2), which is an exception to the bribery statute that allows a witness to be paid "reasonable costs" to "provide truthful information." The eighth and ninth statutes relied on by the majority, are quite different from the preceding seven statutes. The eighth statute, MCL 400.111b, is part of the Social Welfare Act and it provides, in pertinent part, that a healthcare "provider shall certify that a claim for payment . . . does not contain untrue, misleading, or deceptive information" and that the "provider shall supply complete and truthful information as to his or her professional qualifications and training . . . ." MCL 400.111b(17) and (20). The ninth statute, MCL 333.17014, is part of the Public Health Code and sets forth legislative findings, rather than substantive law. It explains that the related substantive laws were designed to provide "objective, truthful information" so that women can make informed decisions about abortions.

MCL 767.6 and other related statutes.[19]  As this Court has recognized, this kind of legislative history constitutes the "highest quality" of legislative history.  *In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003).  One of the other statutes that the majority relies on, MCL 750.122, was also enacted in the wake of *McIntire*.[20]  Thus, seven out of the nine statutes the majority relies on were amended or enacted immediately after *McIntire* was decided.  This is significant because it strongly suggests that before *McIntire* was decided, the Legislature understood that the term "information" by itself means "truthful information," and it was not until after *McIntire* was decided that the Legislature felt it was necessary to modify "information" with "truthful" in order to limit the protections of these statutes to only "truthful information."[21]

---

[19] *McIntire* was decided on September 14, 1999 and these statutes were amended on December 28, 1999.

[20] MCL 750.122 was enacted on January 9, 2001 and became effective on March 28, 2001.

[21] The majority also suggests that because numerous statutes expressly state that compelled information "shall not be used against the witness in a criminal case, except for impeachment purposes or in a prosecution for perjury," see, e.g., MCL 750.453, and the instant statute does not, we should not incorporate such an exception into the instant statute.  However, there are only eight statutes that contain this language and none of them contained that language until they were amended in 1999 immediately after *McIntire* was decided.  See MCL 29.7(4); MCL 750.125(5); MCL 750.157; MCL 750.453; MCL 767.6(3); MCL 767.19b(2); MCL 780.702(3); MCL 780.702a(6).  In addition, see the discussion of *Glickstein v United States*, 222 US 139; 32 S Ct 71; 56 L Ed 128 (1911), later in this opinion.

15

The other two statutes that the majority relies on were enacted before *McIntire* was decided, but are quite distinguishable. To begin with, MCL 400.111b, a statute within the Social Welfare Act, refers to both "untrue, misleading, or deceptive information" and "truthful information." Given that the statute initially uses the phrase "untrue information," it makes sense that when the statute subsequently uses the term "information," the Legislature would choose to clarify that it was referring to "truthful information" on this occasion, rather than the previously mentioned "untrue information."

The final statute the majority relies on, MCL 333.17014, a statute within the Public Health Code, sets forth the legislative findings that supported the Legislature's enactment of MCL 333.17015 and MCL 333.17515. Legislative findings do not constitute substantive law. See *Nat'l Pride at Work, Inc v Governor*, 481 Mich 56, 79 n 20; 748 NW2d 524 (2008). Although the legislative-findings statute, MCL 333.17014, on one occasion refers to "truthful information," neither of the substantive statutes, MCL 333.17015; MCL 333.17515, refers to "truthful information," even though one of the substantive statutes, MCL 333.17015, repeatedly refers to "information" and, given the context, it is clear that the statute is referring to "truthful information." Furthermore, although the legislative-findings statute itself repeatedly uses the word "information" in a manner that makes it clear the Legislature is referring to "truthful information," the Legislature only modified the term "information" with "truthful" on a single occasion in that statute.

The majority thus has identified nine statutes that use the phrase "truthful information" and from this the majority concludes that "information" unmodified by "truthful" must include both truthful and false information. However, the majority does

16

not take into account that the Legislature has used the word "information" in 4,849 statutes and only nine of these statutes modify "information" with "truthful." Does the majority truly believe that in the other 4,840 statutes in which the Legislature used "information" it was referring to both true and false information?[22] I simply cannot believe it possible, that in the nearly 5,000 laws enacted by our Legislature in which "information" was required to be provided, considered, acted on, shared, or evaluated, those laws were unconcerned with, or disinterested in, whether such information was true or false.

Although the Legislature added "truthful" before "information" in a handful of statutes following *McIntire*, the Legislature likely did not believe it needed to add "truthful" before "information" when it enacted the DLEOA in 2006 (seven years after *McIntire* was decided) because: (a) the DLEOA was viewed as a codification of *Garrity* and its progeny and it is clear that false statements are not protected under those decisions; and (b) the Legislature almost certainly perceived the word "information" as only connoting truthful information and simply did not feel obligated in perpetuity to add "truthful" every time it used the word "information" just as it might not feel obligated in

---

[22] I recognize that in a few of these statutes the word "information" is modified by other adjectives, such as "inaccurate" or "misleading;" as previously discussed, however, I believe that in the great majority of these statutes "information" is used to mean "truthful information."

17

perpetuity to say "dogs but not cats" in place of "dogs" if, for example, this Court had issued an opinion stating that "dogs" means both "dogs and cats."[23]

The majority's reliance on *McIntire* for anything other than explaining why the Legislature amended MCL 767.6 and similar statutes to add the word "truthful" is misplaced. As the majority explains, *McIntire* involved the interpretation of MCL 767.6, which at the time provided, "[n]o person required to answer such questions shall thereafter be prosecuted for any offense concerning which such answers may have tended to incriminate him." MCL 767.7, as amended by 1951 PA 276. Although the majority claims that the statute at issue in *McIntire* and the statute at issue here are "similar," and perhaps in some ways they are, there is a critical and relevant difference-- only the latter pertains to "information." It is one thing to say that a person can answer questions

---

[23] At some juncture after this Court has interpreted words in a highly unusual manner, the Legislature must be allowed again to use words as they are commonly understood by the people whom they represent. That is, it is one thing to say that when, in the ordinary course of statutory interpretation, this Court has interpreted a word, the next time the Legislature uses that same word, it is presumed to mean what we have previously said it means, but it is quite another thing to say that when this Court has interpreted a word in a highly unusual manner, we will presume that whenever that same word is subsequently used by the Legislature, it is presumed to mean what we have previously said it means. After some reasonable duration, we have to assume that when the Legislature uses the word "dogs," it means "dogs," and not forevermore "dogs and cats." And perhaps most importantly, in the final analysis, it is this Court that must adhere to the language of the people and their representatives and not the people and their representatives that must adhere to the language of this Court. It was this Court's decision in *McIntire* in 1999 that has now led to the extraordinarily odd circumstance 17 years later, that in order to effectively communicate its intentions, the Legislature apparently must whenever it seeks to legislate concerning "information" systematically insert in the law a disclaimer-- "provided, however, that the information requested or provided in this statute be truthful." This Court may understand the point of such language, but others who are governed by this law will only be confused and befuddled.

falsely; it is another thing to say that a person provides "information" when he or she provides false statements. *McIntire* reached the former holding, but not the latter. That is, nothing within *McIntire* can be read to suggest that false statements constitute "information." The only thing that *McIntire* held was that under MCL 767.6, as it was drafted at the time, a witness who answered questions under an order granting immunity was entitled to such immunity, regardless of whether the witness answered the questions truthfully or falsely.

I agree with the majority that *McIntire*'s actual holding has not been overruled by this Court and presumably never will be because, as already discussed, the statute at issue has since been amended in such a way that the issue addressed in *McIntire* will not arise again. The majority seems to believe that this means that we are forevermore encumbered with *McIntire*'s holding that a person's statements do not have to be truthful in order for that person to be entitled to immunity. Apparently, the majority believes that to be the case even though *McIntire* has been superseded by statute and the Legislature has employed statutory language that is entirely different from the language that was at issue in *McIntire*. Importantly, the statute at issue in *McIntire* did not use the word "information," and *McIntire* thus did not address its meaning, but the majority uses *McIntire* to support its conclusion that "information" refers to both true and false statements. However, because the statute at issue here, unlike that at issue in *McIntire*, only protects "information," *McIntire* does not require us to hold that false statements are protected by the statute at issue here. And simply because the Legislature directly reacted to *McIntire* by inserting the word "truthful" before the word "information" in a handful of statutes, does not mean that we must forevermore hold that whenever the

19

Legislature does not add the word "truthful" before "information," it must be referring to both truthful and false statements. Rather, what most obviously can be drawn from the Legislature's response to *McIntire* is that *McIntire*'s equivalent treatment of truthful and false statements was squarely repudiated, an equivalency that is exactly repeated in the majority's interpretation in the instant case.

The majority asserts that "the existence of *McIntire* at the time the DLEOA was enacted provides us great insight into the intent of the Legislature" and "we see no reason to abandon *McIntire* now." However, given that *McIntire* did not interpret the term "information" as we are called upon to do now, and given that *McIntire* has already been emphatically superseded by legislative enactments, see note 19 of this opinion, I am baffled as to what "great insight into the intent of the Legislature" the majority has derived from *McIntire* that I am supposedly urging it to "abandon." If this "great insight" is this Court's obligation to adhere to the plain language of a statute, I am hardly urging the majority to abandon this. Indeed, it is precisely the plain language of the DLEOA that causes me to conclude that the act does not protect false statements. That is, because the DLEOA only protects "information," and because the plain meaning of the term "information" does not encompass false statements, the DLEOA does not protect false statements.

## 2. "COMPELLED"

Additionally, MCL 15.391 defines the term "involuntary statement" as "information provided by a law enforcement officer, if *compelled* . . . ." (Emphasis

20

added.)  Not only are lies not "information," but they are also not "compelled."[24]  That is exactly why the Fifth Amendment prohibition against compelled self-incrimination does not protect perjury.  See *Wong*, 431 US at 178 ("It grants a privilege to remain silent without risking contempt, but it does not endow the person who testifies with a license to commit perjury.") (citation and quotation marks omitted); *Lefkowitz v Turley*, 414 US 70, 77; 94 S Ct 316; 38 L Ed 2d 274 (1973) ("The object of the Amendment 'was to insure that a person should not be compelled . . . to give testimony which might tend to show that he himself had committed a crime.' ") (citation omitted).  Neither the Fifth Amendment nor the DLEOA was ever intended to protect false statements made to cover up criminal activity.

As previously noted, the Fifth Amendment provides that no person "shall be compelled . . . to be a witness against himself . . . ."  US Const, Am V.  "The design of the [Fifth Amendment] privilege is . . . to protect [a person] against being compelled to furnish evidence to convict him of a criminal charge."  *Brown v Walker*, 161 US 591, 605-606; 16 S Ct 644; 40 L Ed 819 (1896).  In other words, "the Fifth Amendment privilege speaks only of compulsion[.]"  *People v Wyngaard*, 462 Mich 659, 672; 614 NW2d 143 (2000).  Therefore, the applicability of Fifth Amendment protection often turns on whether a person's testimony or statements were compelled.[25]

---

[24] Defense counsel for defendant Harris admitted this at oral arguments when he stated, "Nobody's compelled to lie . . . ."

[25] See, e.g., *Minnesota v Murphy*, 465 US 420, 440; 104 S Ct 1136; 79 L Ed 2d 409 (1984) (holding that because the defendant's disclosures were not compelled incriminations, he could not invoke the Fifth Amendment privilege); *Miranda v Arizona*,

21

Pertinent to the instant case, the United States Supreme Court has long recognized that the Fifth Amendment does not endow a person with a license to commit perjury. See *Glickstein v United States*, 222 US 139, 142; 32 S Ct 71; 56 L Ed 128 (1911) ("[T]he immunity afforded by the constitutional guaranty relates to the past and does not endow the person who testifies with a license to commit perjury."). In *Glickstein*, the Court construed a similar immunity statute that did not contain an exception for perjury.[26] In addressing whether the statute immunized false statements, the Court stated:

> [T]he statute expressly commands the giving of testimony, and its manifest purpose is to secure truthful testimony, while the limited and exclusive meaning which the contention attributes to the immunity clause would cause the section to be a mere license to commit perjury, and hence not to command the giving of testimony in the true sense of the word.
>
> The argument that because the section does not contain an expression of the reservation of a right to prosecute for perjury in harmony with the reservations in Rev. Stat., § 860, and the act of 1893, therefore it is to be presumed that it was intended that no such right should exist, we think, simply begs the question for decision, since it is impossible in reason to conceive that Congress commanded the giving of testimony, and at the same time intended that false testimony might be given with impunity in the absence of the most express and specific command to that effect.
>
> Bearing in mind the subject dealt with we think the reservation of the right to prosecute for perjury made in the statutes to which we have referred was but the manifestation of abundant caution, and hence the

---

384 US 436, 467; 86 S Ct 1602; 16 L Ed 2d 694 (1966) ("[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.").

[26] The statute provided, in pertinent part, " 'no testimony given by him shall be offered in evidence against him in any criminal proceeding.' " *Glickstein*, 222 US at 140-141 (citation omitted). See also note 21 of this opinion.

absence of such reservation in the statute under consideration may not be taken as indicative of an intention on the part of Congress that perjury might be committed at pleasure. [*Id.* at 143-144.][27]

The Court concluded that the statute, in compelling the giving of testimony, did not confer immunity wider than that guaranteed by the Constitution. *Id.* at 142-144.

I believe *Glickstein* is instructive in assessing the majority's argument that the DLEOA includes false statements because the Legislature did not use the term "truthful information." *Glickstein* rejected the defendant's analogous argument that, because the statute in that case did not include a perjury exemption that had been included in other statutes, such an exemption did not exist. Similarly, the Michigan Legislature's use of "truthful" in other statutes appears at most to only reflect a "manifestation of abundant caution" rather than suggesting that the DLEOA does not extend to false statements. *Id.* at 144.

Further, although *Glickstein* did not clearly explain why the Fifth Amendment does not endow a person with a license to commit perjury, it recognized the critical relationship between compelled statements and the truth. The United States Supreme Court expounded on this relationship in *United States v Knox*, 396 US 77; 90 S Ct 363; 24 L Ed 2d 275 (1969), holding that the Fifth Amendment does not protect perjury because those false statements are not compelled. In *Knox*, the defendant was indicted for including false, material information in his tax filings. He sought Fifth Amendment

---

[27] This passage suggests that, absent manifest legislative intent to the contrary, statutes compelling the giving of testimony are presumed to require that the testimony be truthful. If such a presumption had been in play in *McIntire*, perhaps this Court would have reached a different result.

23

protection, arguing that his tax filings were compelled by statute and, had he not filed truthful and complete forms as required, he would have incriminated himself. Similarly, filing no forms at all would also have subjected him to prosecution. The Court rejected the defendant's argument, noting he had "taken a course other than the one that the statute was designed to compel, a course that the Fifth Amendment gave him no privilege to take." *Id.* at 82. The Court stated, "when [defendant] responded to the pressure under which he found himself by communicating false information, this was simply not testimonial compulsion." *Id.* Similarly, in *Wong*, 431 US at 178, the Court confirmed that the Fifth Amendment does not condone perjury, emphasizing that "the predicament of being forced to choose between incriminatory truth and falsehood, as opposed to refusing to answer, does not justify perjury."[28]

*Garrity* statements are protected by the Fifth Amendment because, by requiring an individual to choose between self-incrimination and job forfeiture, the resulting statements are compelled. *Garrity*, 385 US at 497-498. These statements are "infected by the coercion inherent in [the] scheme of questioning and cannot be sustained as

---

[28] Other courts have reached the same conclusion. See, e.g., *United States v Thomas*, 612 F3d 1107, 1128 (CA 9, 2010) ("But [defendant] was not in any way compelled to 'knowingly giv[e] Grand Jury testimony that was intentionally evasive, false, and misleading' by virtue of her grand jury subpoena.") (second alteration in original); *United States v Phillips*, 540 F2d 319, 332 (CA 8, 1976) ("[Defendant's] decision to proffer false answers was in no way compelled; it was a voluntary decision on his part."); *Commonwealth v Good*, 461 PA 546, 553; 337 A2d 288 (1975) (holding witnesses who lied to a grand jury were not compelled to be witnesses against themselves); *United States v Tramunti*, 500 F2d 1334, 1342 (CA 2, 1974) ("If he gives false testimony, it is not compelled at all. . . . [False testimony] is not the incriminatory truth which the Constitution was intended to protect.").

24

voluntary . . . ." *Id.* But, *Garrity* does not provide a license to lie or commit perjury. *United States v Veal*, 153 F3d 1233, 1243 (CA 11, 1998).[29] The Fifth Amendment does not protect false *Garrity* statements because those "deliberate, false statements" result from "independent, voluntary choices." *Id.* at 1244.[30] The statements therefore provide an avenue for the prosecution of obstruction of justice.

The issue here is whether defendants' statements were protected by the DLEOA, not the Fifth Amendment. But in the DLEOA, the Legislature used the term "compelled" when providing statutory protection to *Garrity* statements. As already explained in this opinion, when considering whether the privilege against self-incrimination is implicated, Fifth Amendment jurisprudence focuses extensively on whether the testimony or statements were "compelled." In this context, "compelled" has acquired a particular meaning, requiring courts to consider whether specific circumstances giving rise to compulsion are present such that Fifth Amendment protection applies.[31] Because of this, "compelled" should be construed and understood in accordance with that meaning.

---

[29] *Veal* was overruled on other grounds by *Fowler v United States*, 563 US 668 (2011).

[30] The fact that *Garrity* statements are not made under oath is immaterial to the Fifth Amendment analysis. *Veal*, 153 F3d at 1241 ("Like false testimony before a grand jury, the Court has not excluded from criminal liability false statements made to government agents or agencies, whether or not those statements were made under oath."). See also *LaChance v Erickson*, 522 US 262, 267; 118 S Ct 753; 139 L Ed 2d 695 (1998) (holding that it was irrelevant that statements were not made under oath for the purpose of criminal culpability for making false statements to government agency investigators).

[31] Cf. *Howes v Fields*, 565 US ___, ___; 132 S Ct 1181, 1189; 182 L Ed 2d 17 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.").

25

MCL 8.3a; *People v Law*, 459 Mich 419, 425 n 8; 591 NW2d 20 (1999). Giving the appropriate meaning to this term of art, the DLEOA does not bar the use of the statements because defendants' decision to lie constituted a voluntary choice that was not "compelled under threat of dismissal from employment or any other employment sanction . . . ." MCL 15.391.

The government here did not "compel" defendants to lie. Rather, it sought only to "compel" defendants to tell the truth. That defendants chose to provide exculpatory falsehoods, rather than inculpatory truths, resulted in their loss of protection under the Fifth Amendment and MCL 15.393. See *Wong*, 431 US at 178 ("[E]ven the predicament of being forced to choose between incriminatory truth and falsehood, as opposed to refusing to answer, does not justify perjury.").[32] Our Constitution and laws protect compelled "information"-- incriminating truths, not exculpatory falsehoods.[33]

---

[32] Nothing in the way of rational public policy would result from protecting exculpatory falsehoods. By such a conclusion, the government would be unable to obtain information that it needs to uncover police misconduct, and officers who possess such information would be permitted to lie about it without concern for criminal repercussions.

[33] For what it is worth, interpreting MCL 15.393 as providing the same protections as *Garrity* and its progeny, i.e., as not protecting false statements, is also consistent with House Legislative Analysis, SB 647, December 7, 2006, which states:

> The U.S. Supreme Court has already established that involuntary statements made by law enforcement officers during internal investigations cannot be used against the officers in a criminal prosecution. Concerning this matter, the bill would simply *codify the federal court ruling*. [Emphasis added.]

It is likewise consistent with Senate Legislative Analysis, SB 647, February 20, 2007, which states:

3. CONTEXT

It must finally be noted that "[a] court does not construe the meaning of statutory terms in a vacuum." *Manuel v Gill*, 481 Mich 637, 650; 753 NW2d 48 (2008) (quotation marks and citation omitted). "Rather, we interpret the words in their context and with a view to their place in the overall statutory scheme." *Id.* (quotation marks and citations omitted). See also *Michigan ex rel Gurganus v CVS Caremark Corp*, 496 Mich 45, 59; 852 NW2d 103 (2014) ("Individual words and phrases are not read in a vacuum; we examine the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme.") (quotation marks and citation omitted). The statute at issue here is based upon an obvious theory of quid pro quo: police officers provide information to the government about police misconduct and in exchange the government agrees not to use the information against the officers. Both the government and the officers thereby receive a benefit-- the government receives information that may be helpful in identifying criminal misconduct and the officers effectively receive immunity.[34] However, where the

---

By providing that an involuntary statement made by a law enforcement officer, and any information derived from it, may not be used against the officer in a criminal proceeding, the bill effectively *codifies Garrity protections in Michigan statutory law*. [Emphasis added.]

Contrary to the majority's suggestion, by the time that the DLEOA was enacted in 2006, the "*Garrity* protections" were well understood as excluding protection of false statements. While I recognize the limitations inherent in reliance on legislative analyses as an aid in the construction of a statute, see *In re Certified Question*, 468 Mich at 115 n 5, it is nonetheless notable when the construction of a statute, reached without reliance on a legislative analysis, conforms fully with such a legislative analysis.

[34] More specifically, the officers' statements cannot be used against them in a criminal proceeding. However, the practical effect of that is almost always going to be the same as immunity, as it was in this case.

27

officers proceed to lie to the government, the government is deprived of that to which it was entitled in exchange for the grant of immunity-- information.[35] There is simply no longer any consideration given by the officers. i.e., there is no quid pro quo. In such a situation, the officers should likewise be deprived of that for which they bargained-- immunity. Otherwise, they would receive what they bargained for-- immunity-- without having to fulfill their part of the bargain-- providing information-- and the manifest truth-seeking function of the statute would thus be nullified. No Legislature, and no legislator, could conceivably have intended such a result. As the Court of Appeals explained:

> We conclude that the Legislature's manifest intent was to create a mechanism for facilitating internal police investigations and to provide an incentive for officers who cooperate by providing needed facts. The Legislature certainly did not intend to immunize police officers by precluding the use of their lies and false statements in criminal proceedings. Indeed, such a strained construction of MCL 15.393 would be wholly contrary to the Legislature's purpose in enacting the statute. In sum, the plain language of MCL 15.391(a) establishes that an "involuntary statement" includes only truthful and factual information. Quite simply, when an officer lies, he or she provides no "information." Accordingly, MCL 15.393 does not preclude the use of the officer's lies in a criminal proceeding. [*Hughes*, 306 Mich App at 130.]

Reference to "information provided by a law enforcement officer," MCL 15.391(a), in exchange for immunity, cannot reasonably be interpreted to mean simply any utterance of words; instead, it must reasonably be interpreted as meaning truthful information. Given

---

[35] Cf. *Apfelbaum*, 445 US at 132 (Brennan, J., concurring in the judgment) (recognizing that the perjury exception to the Fifth Amendment is based in part on "the simple reality that affording the witness a right to lie with impunity would render the entire immunity transaction futile."); *id*. at 135 (Blackmun, J., concurring in the judgment) ("Perjury or the making of false statements under a grant of immunity thus violates a basic assumption upon which the privilege and hence the immunity depend.").

28

that the obvious purpose of the statute at issue is to assist in the discovery of police misconduct, an indispensable element of the induced statement is that it be truthful so that it may-- in fact or potentially-- assist in such discovery. If the police officers who are questioned are allowed to provide false statements without consequence, i.e., without adversely affecting their guarantee of immunity, not only is the government not assisted in its responsibilities to investigate and punish police misconduct, but it may be affirmatively hindered or obstructed in this regard by the false statements, which indeed is exactly what occurred in the case at hand.[36] In this case, after defendants stated that

---

[36] As one commentator explained:

> The state has a strong preference against allowing persons to lie with impunity, for lying prejudices the state in ways that neither silence nor truth-telling does. Silence with impunity may disable the state from acquiring information from a witness, but it has the virtue of leaving the state no worse off than if the witness had never existed. Truth-telling with impunity may disable the state from using a witness's statements against him criminally, but it enlightens the state and enables the state to use the information for all other purposes. In contrast, *lying with impunity leaves the state worse off than it was before.* Lying with impunity not only disables the state from using the lies as criminal evidence against the person, but it affirmatively misleads and confuses the state regarding the truth. Not surprisingly, the Court finds no place for lying:
>
> > In [the] constitutional process of securing a witness'[s] testimony, perjury simply has no place whatever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings . . . . Congress has made the giving of false answers a criminal act punishable by severe penalties; [for] in no other way can criminal conduct be flushed into the open where the law can deal with it. [Westen, *Answer Self-Incriminating Questions or Be Fired*, 37 Am J Crim L 97, 123-124 (2010), quoting *United States v*

defendant Hughes did not have any improper physical contact with the complainant, the investigation was terminated and it was not revived until a year later and that was *only* because the person who had been assaulted by defendant Hughes hired a private investigator who later discovered the video recording of the assault. Allowing an officer to provide false statements and yet receive full immunity utterly defeats the obvious purpose of the statute and serves no comprehensible alternative purpose.[37] As a result, I believe that construing the DLEOA in light of its obvious purpose-- assisting in the discovery of police misconduct-- strongly supports the conclusion that "information" presupposes "truthful information." Simply put, there is no reason to enact an immunity

---

*Mandujano*, 425 US 564, 576; 96 S Ct 1768; 48 L Ed 2d 212 (1976) (alterations in original).]

[37] The majority asserts that "the protections offered by the DLEOA are intended to encourage and facilitate officers' participation in internal investigations, with the goal of rendering those investigations more fruitful and effective." I fail to see how lies render investigations more fruitful and effective. Indeed, I believe that they have the very opposite effect-- they hinder and thwart investigations. I do not believe that any reasonable Legislature could conceivably have wished to encourage police officers to lie during an internal investigation, or even been disinterested in whether such lies took place. The majority posits that "[n]ot all statements, after all, are clearly true or entirely false, and the Legislature may have concluded that qualifying the DLEOA's statutory protections based on veracity would unduly complicate the implementation of those protections or undermine the certainty and effectiveness of the protections offered." It is one thing to conclude that the Legislature intended to protect statements that were made by a person who at the time *believed* the statements to be true, even if it is subsequently determined that the statements were incorrect, but it is quite another thing to suppose that the Legislature intended to protect statements that were made by a person who *at the time* knew that his or her statements were false, which is what happened in the instant case. Given that the Legislature only extended protection to "compelled information," I simply cannot believe it intended to protect deliberate falsehoods. Deliberate falsehoods clearly do not constitute "compelled information."

30

statute if it cannot produce "information" that is helpful in uncovering police misconduct. As the United States Supreme Court explained, "it is impossible in reason to conceive that Congress commanded the giving of testimony, and at the same time intended that false testimony might be given with impunity in the absence of the most express and specific command to that effect." *Glickstein*, 222 US at 143. Similarly, I am not persuaded that the DLEOA protects false statements absent any "express and specific command to that effect," which the DLEOA does not contain. *Id*.

## III. CONCLUSION

Because I agree with the Court of Appeals that neither the Fifth Amendment nor the DLEOA forbid the use of a law enforcement officer's false statements in a subsequent prosecution for obstruction of justice, I respectfully dissent and would affirm the judgment of the Court of Appeals.

Stephen J. Markman
David F. Viviano